EXHIBIT N — Formal Response to Assistantship Non-Renewal and Retaliation

| | |
|---|---|
| **TO:** | Noel Wilkin, Provost & Executive Vice Chancellor for Academic Affairs |
| **CC:** | **Jennifer Simmons**, Assistant Provost<br>**Danielle Ambrose**, Registrar<br>**Annette Kluck**, Dean of the Graduate School<br>**Yi Yang**, Chair, Department of Pharmacy Administration<br>**Marie Barnard**, Graduate Program Coordinator<br>**John Bentley**, Director, Center for Pharmaceutical Marketing and Management<br>**Robert Welch**, Director, National Center for Cannabis Research and Education |
| **FROM:** | Omokhodion (Alfred) Eriakha (Student Number 10859637) |
| **DATE:** | July 15, 2025 |
| **SUBJECT:** | Formal Response to June 30, 2025, Memorandum Regarding Non-Renewal of Graduate Research Assistantship |

**Dear Dr. Wilkin,**

I hope this letter finds you well. I am writing in response to one of several memoranda issued by the Department of Pharmacy Administration on June 30, 2025, which abruptly informed me of the **non-renewal of my Graduate Research Assistantship** for the 2025–2026 academic year.

On July 7, I submitted a formal rebuttal to a related memorandum—one that **alleged "disruption"** without substantiating evidence and proceeded to **recommend academic probation** without offering any supporting justification. This current letter builds upon that initial response. It is offered not only to contest the series of adverse actions recently taken against me, but also to situate them within a broader and more troubling pattern of departmental conduct—one that, in both substance and timing, raises serious and urgent concerns about possible retaliatory intent.

**1. Context and Prior Rebuttal**

In my July 7 rebuttal, I outlined serious concerns regarding the Department's decision to issue an unsubstantiated allegation and recommend a significant academic sanction—actions taken without

the transparency or procedural care such measures require. That letter addressed not only lapses in due process, but also the Department's apparent disregard for federal and institutional policies. It further pointed to a broader and more troubling pattern—one that has not only impeded my academic progress and affected my well-being, but now threatens the continuity of my studies through the sudden and unexplained withdrawal of my Graduate Research Assistantship.

Among the specific concerns I raised were the Department's:

- Persistent disregard for established institutional policies,

- Denial of access to my educational records,

- Repeated failure to provide disability accommodations as required under federal law,

- Actions that have contributed to sustained emotional distress,

- Potential to cause lasting harm to my academic record, future educational opportunities, and professional reputation; and

- Documented pattern of actions that appear aimed at discouraging further inquiry and evading accountability.

In that same letter, I detailed a sequence of materially adverse actions taken by the Department on June 30, 2025—the timing and substance of which raise serious concerns about retaliatory motive, procedural fairness, and the overall integrity of the Department's decision-making process. These actions, issued in close succession and without meaningful explanation, included:

- **A vague and unsubstantiated allegation** of "disruption", issued without any supporting factual detail or evidence,

- **A recommendation for academic probation** based solely on that unsupported allegation,

- **Coercive pressure** to submit a developmental document (the "Abilities Transcript") under threat of academic sanction, despite the Department's full awareness of unresolved procedural barriers that rendered its good-faith completion impossible, and
- An abrupt notice of **non-renewal of my Graduate Research Assistantship**, delivered without reference to any documented concerns regarding my performance.

Taken individually, each of these actions raises serious questions about fairness and due process. Considered collectively, however, they present a deeply concerning picture—one that suggests a coordinated response not due to misconduct on my part, but to my repeated, good-faith efforts to raise concerns, report procedural violations, and assert the rights afforded to me under institutional and federal policy.

Rather than engaging with the specific, substantive, and well-documented issues I raised through appropriate channels, the Department chose instead to respond with punitive measures—actions strategically employed to deter further advocacy, compel compliance through coercive means, and shift focus away from the Department's own procedural shortcomings.

## 2. The Assistantship Non-Renewal in Context

To fully appreciate the seriousness of the department's punitive actions, it is important to examine one of the most consequential among them: the sudden and unexplained decision not to renew my Graduate Research Assistantship. This decision was conveyed in a June 30 memorandum, which cited the following broadly worded departmental policy:

> *Reappointment is contingent upon **availability of funds, satisfactory academic progression by the student, satisfactory involvement and performance in research and teaching activities, program needs, and recommendation by the Department Faculty**.*

Given the breadth and ambiguity of the criteria cited, **I respectfully request clarification from the Department of Pharmacy Administration** as to which specific factor was determinative in the decision not to renew my assistantship. Even in isolation, the use of such vague and expansive rationale would warrant concern. But in the context of my recent engagement in protected activities, the absence of a clear, specific, and evidence-based explanation becomes all the more troubling.

As the remainder of this letter will show, the adverse actions I experienced were not accompanied by any documented performance-related concerns. In the absence of such objective justification, a troubling pattern emerges—one suggestive of an underlying motive: retaliation for my engagement in protected advocacy. This possibility not only calls into question the fairness of the decision but also raises broader concerns about the values guiding the department's conduct.

## 3. Record of Diligent Service and Contribution

I began my role as a Graduate Assistant in the Department of Pharmacy Administration in Fall 2021. From the outset, I approached my responsibilities with diligence, consistency, and care—initially as a teaching assistant, and later in increasingly research-focused roles. Across all assignments, I have sought to demonstrate not only competence but a genuine investment in the department's academic mission. My work has reflected a commitment to academic rigor, intellectual curiosity, and sustained diligence—qualities I believe are closely aligned with the values the University of Mississippi seeks to uphold.

At no point over the past four years was I informed—formally or informally—that my performance was lacking or that my assistantship was in jeopardy. On the contrary, in my most recent role, which began in January 2025 and focused on medical cannabis research, faculty consistently

expressed appreciation for the quality, thoughtfulness, and practical relevance of my contributions. Supporting documentation—including email correspondence, project deliverables, and meeting notes—reflects a clear and consistent record of diligence, engagement, and meaningful collaboration.

It is important to emphasize that my efforts in these roles were never merely transactional or confined to meeting minimum expectations. They were grounded in a genuine passion for research and a deep belief in the significance of the work we were engaged in. As I have conveyed to my assistantship advisor on multiple occasions, I have always viewed this assistantship not simply as financial support, but as a meaningful opportunity to contribute to a broader scholarly mission—a commitment that remains fully intact. Unless explicitly informed otherwise, I remain both willing and eager to continue supporting that mission with the same professionalism, purpose, and intellectual curiosity that have consistently guided my contributions.

## 4. Reasonable Expectations Based on Past Practice

Given the consistency with which I fulfilled my responsibilities—and the complete absence of any indication that my performance was in question—I held a reasonable and well-founded expectation that my assistantship would be renewed for the upcoming academic year. This expectation was not speculative; it was grounded in ongoing, good-faith communication with my assistantship advisor and aligned with the department's established renewal practices.

In our weekly meetings, my advisor consistently identified two contingent factors for the continuation of my assistantship appointment:

- The **renewal of the state-funded research contract**, which was actively being pursued at the time; and

- My **continued interest** in contributing to the collaborative project—an interest I had clearly affirmed.

Our conversations reflected a shared understanding that my assistantship would continue. We regularly discussed upcoming deliverables, future contributions, and long-term research goals—conversations grounded in mutual planning rather than uncertainty. There was never any indication, whether stated or implied, that my performance was a concern or that the renewal of my assistantship was in question. These interactions—combined with the department's established practice of renewing assistantships in the absence of documented concerns—gave rise to what academic and employment policy would reasonably recognize as a **legitimate reliance interest**.

In this context, the sudden and unexplained notice of non-renewal, delivered just days after a series of documented protected activities, raises significant and well-founded concerns. The timing, coupled with the absence of any documented performance-related rationale, suggests that the decision may have been influenced by impermissible considerations rather than grounded in objective, policy-based criteria. These circumstances call not only for a clear and transparent explanation but also for independent scrutiny to ensure that the decision-making process was fair, impartial, and free from retaliatory intent.

5. **Legal and Employment Implications**

The need for a clear and transparent explanation extends beyond considerations of fairness—it reflects a deeper obligation to ensure legal compliance, uphold ethical responsibility, and respect the principles of sound public policy. As organizations such as the **American Association of University Professors (AAUP)** have long emphasized, graduate assistantships—though embedded within academic programs—possess the core attributes of employment: defined

responsibilities, supervisory oversight, and financial compensation. Accordingly, graduate assistants are entitled to fundamental protections, including the right to be free from **coercion, intimidation,** or **retaliation** when asserting their rights or reporting procedural violations.

When a graduate assistant's appointment has been consistently renewed in the past, but is suddenly and inexplicably not renewed following a series of protected activities—and in the absence of any documented performance concerns—it raises serious and well-founded concerns about retaliatory motive. Such motives are expressly prohibited under **professional standards, university policy,** and **federal law.**

According to the U.S. Department of Education's Office for Civil Rights (OCR), establishing a *prima facie* case of retaliation requires demonstrating three key elements:

- That the individual engaged in **protected activity,**
- That the individual subsequently experienced a **materially adverse action**, and
- That a **causal connection** exists between the protected activity and the adverse action.

In the sections that follow, I outline the **protected activities** in which I engaged, alongside the closely timed **adverse actions** that followed. This chronology is offered not merely as a narrative, but as part of a good-faith effort to clarify the factual record and support an objective evaluation of the Department's underlying rationale.

## 6. Protected Activities and Institutional Safeguards

Graduate students at public institutions not only have the **right**, but also the **responsibility**, to raise concerns when procedural irregularities occur, when accommodations are denied, or when institutional standards are not upheld. These rights are firmly grounded in both federal law and university policy. Over the past academic year, I exercised these rights in good faith—engaging in

multiple forms of protected activity that fall squarely within the legal and institutional frameworks designed to safeguard students. These include:

- The **Americans with Disabilities Act (ADA)**,
- **Section 504** of the Rehabilitation Act,
- **Title VI** of the Civil Rights Act,
- The **First Amendment** to the U.S. Constitution,
- The **Family Educational Rights and Privacy Act** (FERPA), and
- The University's **due process, accommodation**, and **anti-retaliation** policies.

My actions were not only permissible—they were affirmatively protected under these standards. To penalize such efforts is to undermine the very systems intended to ensure accountability, uphold student rights, and protect the integrity of academic institutions.

If allowed to stand, the adverse actions taken in response to my protected activities would not only cause lasting harm to my academic trajectory and professional reputation—they would also risk setting a chilling precedent for future student advocacy. The message such a precedent conveys is deeply troubling, yet unmistakable: *that lawful, respectful engagement through appropriate institutional channels may result in sanction or loss of academic support*. This message stands in direct conflict with the core values of fairness, transparency, and academic freedom that the University of Mississippi is both publicly committed to and legally obligated to uphold.

## 7. The Abilities Transcript and Procedural Breakdown

Having established that I engaged in protected activities and subsequently experienced materially adverse actions, I now turn to the critical question of causation. To address this fully, it is first necessary to examine the procedural context surrounding the third adverse action: *the apparent*

*misuse of a departmental tool originally designed to support developmental mentoring and structured academic reflection*—**the Abilities Transcript** (AT).

Among the three memoranda I received on June 30, 2025, one issued a warning of potential reclassification to provisional status, based on the allegation that I had failed to meet a purported non-coursework academic requirement—specifically, the submission of the AT. Although that memorandum omitted critical context and advanced a misleading narrative, I intend to address its ethical and factual mischaracterizations in a separate letter. Here, I focus solely on the AT's purported role in decisions related to assistantship renewal.

On June 25, 2025, I received the following email from the Graduate Program Coordinator:

> *Please see the email I sent you yesterday. As I noted in that email, we need your **Abilities Transcript** for the **discussion at the faculty retreat** that begins Thursday morning. Submission of the Abilities Transcript is a program requirement. As is indicated in our Department Policies and Procedures Guide, **reappointment for assistantship is contingent on several factors including a student's performance and progress**. If you do not submit this by end of business tomorrow, June 25, 2025, **the faculty will not have this to guide their discussion of your performance and progress**. I encourage you to please submit your Abilities Transcript.*

In response, I promptly emailed the Dean of the Graduate School—copying both the Department Chair and Graduate Program Coordinator—stating clearly:

> *I hope this email finds you well. I'm writing to follow up on my June 3 email regarding **unaddressed concerns about deviations from departmental policy in my upcoming comprehensive exam**.*
>
> ***Resolution of this matter is essential for progressing in the program, including meeting with my developmental mentor and completing the Abilities Transcript recently requested by the Graduate Program Coordinator (copied here)**. As noted in your earlier response, the department intends to follow the same process used during my first attempt—a process that is inconsistent with the department's stated policy and one that materially affected the prior outcome.*

> *As outlined in the department's policy on the Abilities Transcript, completion of the form requires a developmental mentoring meeting and thoughtful reflection on one's goals and academic trajectory. Several sections—particularly those addressing future goals and objectives—require a clear and informed plan for progression, which in my case includes preparation for the comprehensive exam.* **Until this matter is resolved, I am unable to begin preparation for the comprehensive examination or complete the form in a way that accurately reflects my academic standing or next steps.**

This communication formally notified the department of specific procedural barriers that made it impossible to complete the AT in a meaningful or procedurally valid way. Yet despite this, no steps were taken to address or mitigate those barriers.

Given the Graduate Program Coordinator's clear framing of the AT as essential to faculty deliberations on assistantship renewal, its absence raises a fundamental procedural question: ***On what basis was the decision not to renew my assistantship made, if the very document deemed necessary for evaluating my performance and progress was never received?***

If the AT were truly essential to the assistantship reappointment process, its absence should have prompted the department to engage with and resolve the procedural barriers that prevented its completion. The decision to move forward with non-renewal despite lacking this supposedly critical input strongly suggests that the outcome may have been predetermined. This raises a deeper concern: *that the AT was not being used as a genuine tool for developmental assessment, but rather as a procedural formality—one intended to lend post hoc justification to a decision that had already been made.*

Even more concerning is the question of **what ultimately informed the non-renewal.** If the decision rested not on merit but on undisclosed factors that were retaliatory or otherwise improper,

they not only undermine the fairness of the outcome but also raise serious concerns about the department's adherence to its legal, professional, and institutional obligations.

## 8. Timeline and Causal Link

Having examined the procedural context surrounding the Abilities Transcript, I now turn to the question of causation. According to guidance from the U.S. Department of Education's Office for Civil Rights, establishing a *prima facie* case of retaliation requires demonstrating a clear connection between protected activity and a subsequent materially adverse action. To support that connection, I offer the following timeline—one that reveals a deeply troubling pattern: *lawful, good-faith advocacy met not with acknowledgment, engagement, or redress, but with abrupt and escalating forms of departmental reprisal.*

- **Prior to April 28, 2025:**

  *I met regularly with my assistantship advisor* to review progress on the state-funded medical cannabis research project. These meetings were productive, with no indication of dissatisfaction or concern.

- **April 28, 2025:**

  *I submitted a formal request for procedural safeguards* to the department's chair and graduate program coordinator ahead of my then-upcoming June comprehensive examination, citing concerns related to *fairness, policy adherence,* and *psychological safety.*

- **Immediately following April 28, 2025:**

  *All research meetings with my assistantship advisor abruptly ceased* without explanation, marking a *sudden departure from prior practice* and coinciding closely with my protected procedural advocacy.

- **May 5-7, 2025:**

*The **Department Chair failed to acknowledge or address any specific concerns I raised**, despite my reiteration of these concerns and their implications for procedural fairness and psychological safety.*

- **May 9, 2025:**

*I formally requested a deferral of the June comprehensive exam due to the department's continued refusal to address these issues. In response, the Department Chair expressed willingness to grant the deferral—but **simultaneously introduced an unrelated reminder that assistantship reappointment was contingent upon departmental discretion**. This response made no attempt to resolve the serious issues I raised and introduced what felt like a veiled warning: **continued advocacy could jeopardize my assistantship**.*

- **May 9, 2025 (continued):**

*I **informed the Department Chair that I would escalate my concerns** through appropriate institutional channels—including Student Disability Services (**SDS**) and the Office of Equal Opportunity and Regulatory Compliance (**EORC**)—and seek **legal counsel** if necessary to protect my rights, well-being, and academic standing.*

- **May 9, 2025 (continued):**

*I **formally escalated these concerns in writing** to the **Dean of the Graduate School** and the **Provost**, documenting issues including **policy deviation, failure to accommodate, coercion, and potential retaliation**.*

- **June 2, 2025:**

*The Dean responded, **affirming aspects of the Department's process that are inconsistent with its documented policy**:*

> "...You expressed an expectation for the individuals who write the questions to be familiar with your interests. The department uses a process through which those faculty have the opportunity to provide input about all comps questions and that was the case with your first attempt. It will be the case with your second attempt as well. Thus, if the faculty members who are most familiar with your interest believe that a question requires modification to align with areas of interest, those faculty members can recommend modifications as they see fit.

> *Beyond the review and input from faculty most familiar with your work, multiple faculty members in the department review the exam questions. Thus, the program has an existing review process to finalize the questions prior to distributing them to a student..."*

- **June 3, 2025:**

*I responded by highlighting how the **department's intended approach directly contradicted its own written policy**, which states explicitly:*

> *"The exam will be **developed** by a committee of three faculty members familiar with the student's research interests."*

**Relegating familiar faculty members to a post hoc review role represents a procedural deviation and materially affected my prior exam outcome.** *Additionally, I documented the Department Chair's assertion that "every faculty member is equally familiar with every student's research interests"—a statement that dismisses the protective intent of the written policy and signals a broader disregard for institutional policies.*

- **June 3 – June 24, 2025:**

*No further response was provided. The concerns I raised remained unresolved.*

- **June 25, 2025 (morning):**

*I sent a **follow-up email to the Dean**, reiterating unresolved policy concerns and **copying the Department Chair, Graduate Program Coordinator, and my assistantship advisor**. I explained how these unresolved issues impaired both my ability to prepare for the comprehensive exam and complete the Abilities Transcript (AT).*

- **June 25, 2025 (evening):**

***My assistantship advisor downloaded a complete archive of our collaborative research folder from Box**, containing months of shared work. This highly uncharacteristic action appeared to signify a unilateral severance of our academic collaboration.*

- **June 30, 2025:**

*Without acknowledging or addressing my previous concerns, the **department enacted a series of adverse actions**. I received **three coordinated memoranda in rapid succession**:*

- o *A **sudden** and **unexplained** notice of **non-renewal** of my Graduate Research Assistantship.*
- o *A **vague** and **unsubstantiated** allegation of "disruption."*
- o *A formal recommendation for **academic probation**, coupled with **coercive pressure** to submit the AT despite documented procedural barriers.*

The timing and sequencing of these actions, closely following my documented protected activities, strongly support the inference of a retaliatory motive. That inference is further reinforced by the complete absence of any prior documented concerns regarding my performance.

Punitive actions of this nature do more than cause individual harm—they erode the foundational values of transparency, accountability, and equity that academic institutions are meant to uphold. When

- *assistantships are withdrawn without explanation,*
- *vague allegations are made without evidence or due process,*
- *academic probation is recommended without clear justification,* and
- *developmental tools are used coercively rather than constructively,*

...the resulting message is unmistakable: ***Good-faith advocacy may be punished through silent sanctions and reputational harm.***

This message stands in direct conflict with the University of Mississippi's stated commitments to fairness, transparency, and academic integrity. If left unaddressed, such actions risk creating a chilling effect—deterring future students from asserting their rights, reporting violations, or engaging in legally protected advocacy. This not only undermines the values the University claims to uphold, but also raises serious legal and public policy concerns.

## 9. Legal and Public Policy Consequences

The coordinated timing, opaque rationale, and departure from established norms surrounding these adverse actions strongly support an inference of retaliation for my prior engagement in protected activity. When an academic department acts in ways that diverge from its own procedures, fails to offer transparency, and does so in close succession to a student's lawful assertion of rights, it gives rise to a reasonable presumption of pretext—especially in the absence of any documented concerns about performance.

In light of this presumption, **I respectfully request a formal, written explanation** from the Department of Pharmacy Administration identifying the **specific, contemporaneous**, and **non-retaliatory** basis for the sudden and unexplained notice of non-renewal of my Graduate Research Assistantship for the 2025–2026 academic year.

The principles underlying this request are not novel. As outlined in the ***Recommended Institutional Regulations on Academic Freedom and Tenure*** by the American Association of University Professors (AAUP):

> *In a case of nonreappointment, if a graduate student academic or professional employee establishes a prima facie case to the satisfaction of a duly constituted committee that considerations that violate academic freedom or governing policies against improper discrimination based on race, sex, national origin, age, disability, marital status, or sexual orientation significantly contributed to his or her nonretention, it is incumbent on those who made the decision to come forward with evidence in support of that decision.*

I believe I have met the threshold for establishing a *prima facie* case. The close temporal proximity between my protected activities and the adverse actions that followed—coupled with the complete absence of any documented performance concerns—gives rise to a strong and reasonable inference of retaliatory motive.

Indeed, the circumstances here invoke the legal doctrine of *res ipsa loquitur—the facts speak for themselves*. When a highly irregular and materially damaging sequence of decisions occurs without transparent, evidence-based justification, the resulting presumption of retaliation is not merely speculative; it is both reasonable and compelling.

Accordingly, consistent with AAUP guidance and the principles of institutional accountability, **the burden now rests with the Department of Pharmacy Administration** to provide a clear, contemporaneous, and non-retaliatory justification for its decision—specifically, the sudden and unexplained non-renewal of my Graduate Research Assistantship for the 2025–2026 academic year.

## 10. Conclusion

In closing, I wish to reaffirm my commitment to pursuing a resolution grounded in transparency, principle, and fairness. I respectfully urge the University to demonstrate a reciprocal commitment—by ensuring that institutional decisions are **grounded in evidence, guided by policy**, and aligned with the core values of academic integrity and **procedural justice**.

The concerns outlined in this letter are not raised lightly. They reflect a careful and well-documented effort to **uphold fundamental student rights**, protect the integrity of academic processes, and ensure that lawful, respectful advocacy is not met with silence or reprisal.

Federal laws, constitutional protections, and university policies exist precisely to safeguard students' ability to voice concerns without fear of retaliation. When materially adverse actions closely follow protected activity, the credibility and effectiveness of those safeguards are not only undermined—they are fundamentally called into question.

The message these actions convey—to me and to every student who experiences or witnesses them—is deeply troubling. It suggests that lawful, respectful, and necessary self-advocacy may be punished rather than protected; that the cost of speaking up for fairness may be sanctions, silence, or lasting professional harm. *No student should ever be forced to choose between their academic future and their right to be treated lawfully, ethically, and with basic dignity.*

The University now faces a defining choice—one that will signal the strength of its commitment to justice, fairness, and the rights of its students. Will it remain silent in the face of serious concerns, or will it take a principled stand in defense of the very values it professes to uphold? This is not merely an administrative matter—it speaks to the core of institutional integrity and public trust.

I remain hopeful that the University will meet this moment with the seriousness, fairness, and transparency it calls for—not only for me, but for all students who look to this institution to uphold their rights, respect their voices, and protect their freedom to think, learn, and speak without fear.

Thank you once again for your time and consideration.

Sincerely,

**Alfred Eriakha**

Graduate Student, Pharmacy Administration

The University of Mississippi