# UNITED STATES DISTRICT COURT

RECEIVED

AUG 29 2025

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF MISSISSIPPI

for the

Northern District of Mississippi

Oxford Division

| | | |
|---|---|---|
| Omokhodion Alfred Eriakha | ) | Case No.   3:25-cv-00226 |
| *Plaintiff(s)* | ) | |
| -v- | ) | |
| | ) | |
| University of Mississippi; Dr. Yi Yang; Dr. | ) | |
| Marie Barnard; Dr. Erin Holmes; Dr. Meagen | ) | |
| Rosenthal; Dr. Annette Kluck; Dr. Jennifer | ) | |
| Simmons | ) | |
| *Defendant(s)* | | |

## MEMORANDUM IN SUPPORT OF PRELIMINARY INJUNCTION
## MOTION

1

# Table of Contents

MEMORANDUM IN SUPPORT OF PRELIMINARY INJUNCTION MOTION ...................... 1

STATEMENT OF FACTS .................................................................................................. 4

    Plaintiff's Academic Background ................................................................................ 4

    Plaintiff's Assistantship Background .......................................................................... 4

    Federal Protections and Retaliation Prohibition ....................................................... 5

    Protected Activities .................................................................................................... 5

    Retaliatory Actions .................................................................................................... 6

    Escalating Retaliation ................................................................................................ 7

    Constructive Expulsion and Compounded Harms ..................................................... 8

ARGUMENT ..................................................................................................................... 10

I.    Plaintiff Has a Substantial Likelihood of Success on the Merits ........................... 10

    A.    ADA Title II and Section 504 – Failure to Accommodate ............................... 10

    B.    ADA, Section 504, and First Amendment Retaliation ..................................... 12

    C.    Procedural Due Process (Fourteenth Amendment / § 1983) ............................ 15

    D.    Stigma-Plus Due Process Violation ................................................................. 21

    E.    Substantive Due Process (Arbitrary and Capricious Sanctions) ...................... 22

    F.    Breach of Contract Under Mississippi Law ..................................................... 25

    G.    Cumulative Likelihood of Success ................................................................... 29

II.   Plaintiff Will Suffer Irreparable Injury Without the Injunction ............................................. 31

III.  The Balance of Equities Strongly Favors Plaintiff ........................................................... 40

IV.   The Public Interest Compels Granting the Injunction ....................................................... 44

V.    Anticipated Defenses Fail ......................................................................................... 47

PRAYER FOR RELIEF ................................................................................................... 53

CONCLUSION ............................................................................................................. 54

## STATEMENT OF FACTS

### Plaintiff's Academic Background

Plaintiff Omokhodion Alfred Eriakha is a doctoral student in the Department of Pharmacy Administration at the University of Mississippi. He has a documented mental health disability that substantially limits major life activities, which he disclosed to multiple faculty members beginning in 2022, including Dr. Erin Holmes and Dr. Marie Barnard. Despite these challenges, Plaintiff has successfully completed all required coursework, achieved program milestones, and consistently maintained good academic standing, with a cumulative GPA of 3.74 on a 4.00 scale.

### Plaintiff's Assistantship Background

Plaintiff began serving as a Graduate Assistant in the Department of Pharmacy Administration in Fall 2021, first in teaching assignments and later in increasingly research-focused roles. From the outset, he approached his responsibilities with diligence and professionalism, consistently demonstrating competence and a genuine investment in his academic and professional work. His record reflects sustained academic rigor, intellectual curiosity, and meaningful collaboration.

At no point during four years of service was Plaintiff ever informed—formally or informally—that his performance was deficient or that his assistantship was in jeopardy. On the contrary, in his most recent role beginning in January 2025, faculty repeatedly expressed appreciation for the quality, thoughtfulness, and practical relevance of his contributions. Supporting documentation—including emails, project deliverables, and meeting notes—confirms a consistent record of diligence and positive performance.

The Graduate Research Assistantship provided Plaintiff with a stipend to cover essential living expenses such as rent, food, and medical costs, as well as tuition remission and health insurance.

4

These benefits were indispensable to his ability to continue and complete his degree. As an international student on an F-1 visa, Plaintiff's lawful presence in the United States depends on maintaining full-time enrollment, adequate funding, and good standing. His education, livelihood, and immigration status were therefore inseparably tied to the continuity of his assistantship and academic standing.

**Federal Protections and Retaliation Prohibition**

Federal law—including the First Amendment, Title II of the Americans with Disabilities Act (42 U.S.C. § 12132), Section 504 of the Rehabilitation Act (29 U.S.C. § 794), and the Due Process Clause of the Fourteenth Amendment, enforceable through 42 U.S.C. § 1983—guarantees that students with disabilities may pursue their education free from retaliation for requesting reasonable accommodations or raising protected concerns about procedural fairness. These protections are reinforced by federal regulations, which expressly prohibit intimidation, coercion, or retaliation against individuals who assert rights under the ADA or Section 504. *See 28 C.F.R. § 35.134(a) (ADA Title II); 34 C.F.R. § 104.61 (Section 504).*

**Protected Activities**

Between November 2024 and June 2025, Plaintiff engaged in a series of protected activities under the ADA, Section 504, and the First Amendment. Specifically, he:

1. Submitted multiple, good-faith requests for disability-related accommodations;
2. Sought access to academic records and clarification of alleged examination deficiencies;
3. Raised procedural due-process and accessibility concerns regarding remediation and examinations;
4. Reported the Department's failure to comply with mandated accommodation procedures;

5. Advocated for adherence to policy-compliant examination processes; and

6. Escalated his concerns to the Graduate School Dean and the Provost.

Almost immediately after these actions, Defendants imposed a series of coordinated sanctions that terminated Plaintiff's Graduate Research Assistantship, downgraded his academic status, and placed his lawful immigration status in jeopardy. The close temporal proximity between Plaintiff's protected activities and Defendants' adverse actions provides strong evidence of retaliatory motive, consistent with the standard set forth in *Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53 (2006)*, and Fifth Circuit precedent.

**Retaliatory Actions**

On June 30, 2025—just five days after Plaintiff reiterated concerns about retaliation and due-process violations—Defendants imposed a coordinated set of materially adverse actions in direct temporal proximity to his protected activities:

1. **Disciplinary Memorandum**. Drs. Holmes, Barnard, and Rosenthal accused Plaintiff of "disruption" and recommended probation, without prior notice, specific factual allegations, or any meaningful opportunity to respond (Exhibits G & H).

2. **Assistantship Termination**. Dr. Yi Yang terminated Plaintiff's Graduate Research Assistantship despite his good standing, absence of documented performance deficiencies, and without consultation or formal review (Exhibits F & I).

3. **Provisional Status Threat**. Dr. Barnard threatened to reclassify Plaintiff to "provisional" status for alleged failure to submit an "Abilities Transcript"—a mentoring and self-development tool—despite the University's knowledge of procedural barriers that rendered good-faith submission impossible (Exhibit J).

6

All three sanctions were issued the same day and within five days of Plaintiff's final protected communication. The temporal proximity, coordinated nature, and retaliatory content create a compelling inference of retaliatory motive, satisfying the standard for materially adverse action under *Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53 (2006)*, and controlling Fifth Circuit precedent.

**Escalating Retaliation**

After Plaintiff submitted rebuttals disputing the disciplinary charges, University officials escalated sanctions: probation was extended from one semester to the remainder of his enrollment, without hearing, notice, or additional evidence—underscoring both retaliatory motive and procedural irregularity.

On August 21, 2025, Dr. Barnard—without addressing Plaintiff's detailed rebuttals—issued a memorandum formally recommending to Dean Annette Kluck that Plaintiff be reduced to "provisional" status. The memorandum introduced new and expanded requirements that had never been previously identified, a post hoc effort to manufacture an "academic deficiency" and retroactively rationalize the disproportionate sanction.

On August 22, 2025, Dean Annette Kluck ratified the downgrade to provisional status. Her letter (Exhibit Z4) omitted mandatory safeguards expressly required by the University's M Book policies governing graduate status changes, including:

- Recommendation by an appropriate faculty committee (such as an advisory or graduate education committee), rather than unilateral action by the Graduate Program Coordinator and Department Chair;

- Reliance on documented academic performance deficiencies, not developmental tools such as the Abilities Transcript; and

- Timing of status changes "ordinarily ... between semesters or enrollment periods," to avoid sudden disruptions jeopardizing tuition, aid, and immigration status.

By intentionally omitting these safeguards, Dean Annette Kluck misrepresented and misapplied University policy while concealing three critical facts: (a) no academic performance deficiency was ever documented; (b) no faculty committee ever recommended Plaintiff's reclassification, as required by University policy; and (c) the status change and its immediate effects were imposed at the beginning of a semester, contrary to policy safeguards directing that such actions "ordinarily" occur between semesters or enrollment periods. Coupled with the misuse of the Abilities Transcript—a developmental reflection tool—repurposed as a punitive device to fabricate a false narrative of "academic deficiency", these omissions highlight the arbitrariness, pretext, and retaliatory intent underlying Defendants' actions.

**Constructive Expulsion and Compounded Harms**

Taken together, Defendants' actions amounted to constructive expulsion. The sanctions have jeopardized Plaintiff's:

- **Academic Standing and Degree Progress** — indefinite probation and barriers to progression;

- **Graduate Assistantship and Livelihood** — loss of stipend, tuition remission, and health insurance;

- **Provisional Status and Academic Record** — permanent stigma and ineligibility for future aid or support;

8

- **Immigration Status and Lawful Presence** — loss of the financial and academic conditions required to maintain F-1 visa eligibility;

- **Professional Reputation and Career Prospects** — enduring harm from being labeled "disruptive";

- **Psychological Health and Chilling Effect** — exacerbation of a documented disability, emotional distress, and deterrence from exercising federally protected rights; and

- **Jurisdiction of this Court** — the risk that removal from the United States would impair Plaintiff's ability to litigate his claims.

The timing, coordination, and severity of these measures confirm that they were not bona fide academic judgments entitled to judicial deference, but rather the culmination of a retaliatory scheme triggered by Plaintiff's protected requests for accommodations and procedural fairness.

# ARGUMENT

To obtain preliminary relief, a movant must demonstrate: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm if relief is denied; (3) that the threatened injury outweighs any harm the injunction may cause the non-movant; and (4) that the injunction will not disserve the public interest. *Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008)*; *Canal Auth. of Fla. v. Callaway, 489 F.2d 567, 572 (5th Cir. 1974)*. Courts apply these factors flexibly and in balance, recognizing that a particularly strong showing on likelihood of success and irreparable harm may be decisive. *Janvey v. Alguire, 647 F.3d 585, 595–96 (5th Cir. 2011)*. Here, all four factors strongly favor Plaintiff.

## I.     Plaintiff Has a Substantial Likelihood of Success on the Merits

### A.  ADA Title II and Section 504 – Failure to Accommodate

Public universities are subject to Title II of the ADA and § Section 504 of the Rehabilitation Act, which require them to provide reasonable modifications to ensure students with disabilities have "meaningful access" to educational programs. *Southeastern Community College v. Davis, 442 U.S. 397 (1979)*; *Alexander v. Choate, 469 U.S. 287 (1985)*. While institutions need not fundamentally alter their academic programs, they must make accommodations that enable qualified students with disabilities to participate on equal terms with their peers. The Fifth Circuit has held that failure to provide such accommodations constitutes unlawful disability discrimination under both statutes. *Bennett-Nelson v. La. Bd. of Regents, 431 F.3d 448 (5th Cir. 2005)*.

A central feature of these statutory duties is **the interactive process**: once a student requests accommodations, the institution must promptly (within fifteen (15) calendar days of receipt of an RA request) and in good faith engage in interactive dialogue to explore and implement reasonable

10

modifications. This obligation attaches at the time of the request, not after litigation or external complaints. Courts have held that a categorical refusal or failure to initiate the interactive process when requested constitutes deliberate indifference and violation of the Rehabilitation Act, and that belated or post hoc gestures do not cure the violation. ***Duvall v. Kitsap County, 260 F.3d 1124 (9th Cir. 2001); Zukle v. Regents of Univ. of Cal., 166 F.3d 1041 (9th Cir. 1999)***. The Fifth Circuit has confirmed the same principle, holding that the failure to accommodate in itself establishes deliberate indifference. ***Cadena v. El Paso County, 946 F.3d 717, 724–25 (5th Cir. 2020)***.

In November 2024 and again in April–May 2025, Plaintiff formally requested disability-related accommodations tied to a documented mental health condition. Specifically, he sought: (1) clarification of the competencies identified as deficient on a prior examination; (2) an asynchronous or virtual remediation format to reduce the psychological strain of in-person proceedings; and (3) either the presence of a neutral observer or the option of a public examination setting—analogous to a thesis or dissertation defense—to ensure fairness and mitigate the impact of his condition. (Exhibits. L, Q).

Defendant Dr. Yi Yang, Chair of the Department, categorically denied both requests. She neither initiated the legally mandated interactive process, nor referred Plaintiff to Student Disability Services, nor offered any alternative accommodations. Instead, she compelled Plaintiff to undergo unmodified, high-stress, in-person remediation—aggravating his documented condition and depriving him of meaningful access to his program.

When senior administrators were later notified, they acknowledged procedural irregularities but nonetheless ratified Dr. Yang's denials. Any subsequent outreach by Student Disability Services occurred only after external complaints and threats of litigation, and cannot retroactively cure the Department's refusal to engage in the interactive process when Plaintiff first requested

11

accommodations. That failure occurred on two distinct occasions—November 2024 and April–May 2025—demonstrating not an isolated oversight but a repeated, official refusal to meet statutory obligations. The duty to engage in the interactive process attaches at the time of each request, not months later, and courts consistently hold that belated or post hoc gestures do not erase earlier violations. *Duvall v. Kitsap County, 260 F.3d 1124 (9th Cir. 2001)*; *Zukle v. Regents of Univ. of Cal., 166 F.3d 1041 (9th Cir. 1999)*; *Cadena v. El Paso County, 946 F.3d 717, 724–25 (5th Cir. 2020)*. By ratifying and perpetuating these denials, senior administrators transformed departmental refusals into an institutional policy-level violation, underscoring deliberate indifference to Plaintiff's federally protected rights.

On this record, Plaintiff is overwhelmingly likely to succeed on his claim that Defendants' categorical refusals to consider or implement accommodations deprived him of meaningful access to his program and reflect deliberate indifference to his federally protected rights, in violation of Title II of the ADA and § Section 504 of the Rehabilitation Act.

## B. ADA, Section 504, and First Amendment Retaliation

Title II of the ADA, § Section 504 of the Rehabilitation Act, and the First Amendment prohibit retaliation against individuals who engage in protected activity, including requesting accommodations, reporting procedural irregularities, or filing grievances. *Feist v. La. Dep't of Justice, 730 F.3d 450, 454 (5th Cir. 2013)* (holding that "requesting an accommodation is protected activity"). To establish retaliation, a plaintiff must show: (1) that he engaged in protected activity; (2) that he suffered a materially adverse action; and (3) that a causal connection exists between the two. *Burlington N. & Santa Fe Ry. v. White, 548 U.S. 53, 68 (2006)*; see also *Raggs v. Miss. Power & Light Co., 278 F.3d 463, 471 (5th Cir. 2002)* (applying this standard in the Fifth Circuit). Where retaliation also targets speech, the First Amendment—enforceable through *42*

*U.S.C. § 1983*—provides parallel protections against government reprisals for constitutionally protected expression.

### 1. Protected Activities

As set forth in the Statement of Facts, between November 2024 and June 2025 Plaintiff engaged in multiple statutorily and constitutionally protected activities. These included: submitting good-faith requests for disability-related accommodations; raising objections to procedural irregularities and accessibility barriers; reporting the Department's failure to comply with mandated accommodation procedures; advocating for policy-compliant examinations; and escalating these concerns to University leadership. Each of these activities is independently protected under Title II of the ADA, § Section 504 of the Rehabilitation Act, and the First Amendment. *See Feist v. La. Dep't of Justice, 730 F.3d 450, 454 (5th Cir. 2013)* ("requesting an accommodation is protected activity").

### 2. Materially Adverse Actions

In close temporal proximity to Plaintiff's protected activities, Defendants imposed escalating sanctions that exceeded ordinary academic measures. On June 30, 2025, Plaintiff was labelled with a vague, unsupported, and stigmatizing "disruption" label, placed on probation without notice or evidence, and stripped of his Graduate Research Assistantship—the sole source of his stipend, tuition remission, and health insurance. Within weeks, the sanctions escalated further: probation was extended indefinitely, and Plaintiff was formally reduced to "provisional" status. This reclassification automatically terminated his funding, health coverage, and F-1 visa eligibility.

These sanctions functioned as constructive expulsion, depriving Plaintiff of the ability to remain enrolled, financially supported, and lawfully present in the United States. Under *Burlington N. &*

*Santa Fe Ry. v. White, 548 U.S. 53, 68 (2006)*, materially adverse actions are those that "would dissuade a reasonable person from engaging in protected activity." The cumulative effect here—loss of livelihood, access to education, health coverage, and lawful immigration eligibility—easily satisfies that standard, as these materially adverse actions would deter any reasonable student from engaging in protected activity and asserting federally protected rights.

### 3. Causal Connection

The chronology establishes a compelling inference of retaliation. Each time Plaintiff engaged in protected activity, Defendants responded within days or weeks with escalating sanctions—progressing from probation for the duration of one semester, to indefinite probation for the remainder of Plaintiff's enrollment, to termination of his Graduate Research Assistantship, and ultimately to reclassification of Plaintiff to "provisional" status. That final sanction carried severe downstream effects, including:

- Academic standing and degree progress placed in jeopardy;
- Loss of stipend, tuition remission, and health insurance;
- Permanent stigma on his academic record;
- Threats to lawful F-1 immigration status;
- Damage to professional reputation and career prospects;
- Exacerbation of disability and psychological harm that chilled further protected activity; and
- Risk to this Court's jurisdiction, as loss of visa status would preclude continued litigation.

Courts consistently hold that such unusually close temporal proximity supports a finding of causation. *Univ. of Tex. Sw. Med. Ctr. v. Nassar, 570 U.S. 338, 362 (2013)*; see also *Porter v. Houma Terrebonne Hous. Auth., 810 F.3d 940, 945 (5th Cir. 2015)* (temporal proximity

14

combined with pretext suffices to show retaliation). Here, the inference is reinforced by the absence of legitimate academic justification, the post hoc and shifting rationales advanced by administrators, and the unprecedented misuse of a non-evaluative mentoring tool—the Abilities Transcript—as a punitive device.

Taken together, the proximity, severity, and pretextual nature of these sanctions make the retaliatory motive not merely plausible, but overwhelming.

## C. Procedural Due Process (Fourteenth Amendment / § 1983)

The Due Process Clause of the Fourteenth Amendment, enforceable through *42 U.S.C. § 1983*, bars state actors from depriving individuals of constitutionally protected property or liberty interests without fair procedures.

The Fifth Circuit has long held that, before a public university may dismiss or suspend a student, it must, at a minimum, provide: (1) written notice of the charges, (2) disclosure of the supporting evidence, and (3) an opportunity to respond before an impartial decisionmaker. *Dixon v. Ala. State Bd. of Educ., 294 F.2d 150, 158 (5th Cir. 1961)*. Even when universities characterize sanctions as "academic," due process still requires that decisions be "careful and deliberate," and not arbitrary, pretextual, or retaliatory. *Bd. of Curators v. Horowitz, 435 U.S. 78, 85 (1978)*; *Regents of Univ. of Mich. v. Ewing, 474 U.S. 214, 225 (1985)*.

## 1. Constitutionally Protected Interests

Public university students hold constitutionally protected property interests in continued enrollment, tuition remission, and assistantship funding, as well as liberty interests in their academic reputation. *Dixon v. Ala. State Bd. of Educ., 294 F.2d 150, 157–58 (5th Cir. 1961)*; *Goss v. Lopez, 419 U.S. 565, 579 (1975)*. These interests cannot be taken without fair procedures,

15

including notice of the charges, disclosure of the evidence, and a meaningful opportunity to be heard.

For Plaintiff, these protected interests included:

- Continued Enrollment in good academic standing, grounded in legitimate expectations created by the University's published policies and departmental handbooks.

- Graduate Research Assistantship Funding, which provided financial compensation, tuition remission, and health insurance—secured through written appointment letters and university policy.

- Academic Reputation, a liberty interest implicated when administrators affixed the stigmatizing and unsupported label of "disruptive," threatening Plaintiff's professional prospects and future educational opportunities.

## 2. Graduate Assistantship Termination Lacked Due Process

Defendants terminated Plaintiff's Graduate Research Assistantship by memorandum without affording even the most basic procedural safeguards. The termination:

- Identified no academic, professional, or performance-related deficiency;

- Offered no substantive rationale beyond a vague reference to a "faculty decision"; and

- Denied Plaintiff any opportunity for prior consultation, explanation, or corrective action.

(Exhibit. F – Email from Chair; Exhibit. I – Assistantship Termination Notification).

Because the assistantship provided stipend funding, tuition remission, and health insurance, its termination deprived Plaintiff of a constitutionally protected property interest. Yet the decision was issued without notice, evidence, or a meaningful opportunity to be heard—falling far short of the constitutional baseline established in *Dixon v. Ala. State Bd. of Educ., 294 F.2d 150, 158 (5th Cir.*

16

*1961)*, and reaffirmed in *Goss v. Lopez, 419 U.S. 565, 579 (1975)*. This was not a careful academic judgment entitled to deference under Horowitz or Ewing, but an administrative act imposed arbitrarily and without process. By stripping Plaintiff of essential educational and financial supports through a one-sided decree, Defendants violated clearly established due process protections.

### 3. Stigmatizing "Disruptive" Label Lacked Due Process

The Fourteenth Amendment requires, at a minimum, written notice and a meaningful opportunity to be heard before punitive measures affecting property or liberty interests may be imposed. *Dixon v. Ala. State Bd. of Educ., 294 F.2d 150, 158 (5th Cir. 1961)*; *Goss v. Lopez, 419 U.S. 565, 579 (1975)*. These constitutional guarantees are not aspirational; they are mandatory safeguards. The University of Mississippi's own M Book mirrors these protections, requiring: (a) a documented discussion with the student before discipline is initiated (p. 11); (b) a written report identifying the factual basis and supporting evidence (p. 12); and (c) notice of the right to appeal only after these steps are satisfied. None of these safeguards were observed. By bypassing both federal due process requirements and their own written policies, Defendants imposed sanctions that were constitutionally defective from the outset.

On June 30, 2025, Defendants Dr. Holmes, Dr. Barnard, and Dr. Rosenthal issued a disciplinary memorandum branding Plaintiff "disruptive" and recommending academic probation. The memorandum provided no factual description of the alleged conduct, cited no supporting evidence, and followed no prior communication with Plaintiff. (Exhibit. G – Email Thread; Exhibit. H – Disruption Memorandum). By imposing a stigmatizing label without notice, evidence, or a factual description of the alleged conduct with sufficient specificity to allow a meaningful opportunity to

respond, Defendants deprived Plaintiff of protected liberty and property interests through an arbitrary and unsupported sanction.

This stigmatizing label carried both immediate and enduring consequences. It was entered into Plaintiff's permanent academic record, was relied upon to impose probation, and later served as the foundation for escalated sanctions. Under the stigma-plus doctrine, reputational injury combined with concrete deprivations—here, indefinite probation, termination of assistantship funding, and reclassification to provisional status—implicates a constitutionally protected liberty interest. *Paul v. Davis, 424 U.S. 693, 710–12 (1976)*; *Doe v. Purdue Univ., 928 F.3d 652, 661–63 (7th Cir. 2019)*.

By affixing a stigmatizing label without affording even minimal procedural safeguards, Defendants deprived Plaintiff of both property and liberty interests through arbitrary, unsupported, and reputationally damaging action. The absence of notice, disclosure of evidence, or a meaningful opportunity to respond rendered the process constitutionally defective from the outset. Because this label was imposed within days of Plaintiff's protected activity, the retaliatory context further undermines any assertion that it reflected a bona fide academic judgment rather than pretextual punishment.

### 4. Indefinite Probation Sanction Lacked Due Process

The University's M Book provides that disciplinary probation "will ordinarily be for the remainder of the student's association with the University," unless a more limited term is recommended by the department. In Plaintiff's case, the Department of Pharmacy Administration expressly recommended a limited, one-semester probation in its June 30, 2025, memorandum.

Nevertheless, on August 5, 2025—just weeks after Plaintiff submitted a detailed rebuttal raising Title II of the ADA, § Section 504 of the Rehabilitation Act violations, procedural irregularities, and concerns about retaliation—the University escalated the sanction to probation for the remainder of his enrollment. This escalation:

- Directly contradicted the Department's express one-semester recommendation;
- Was issued with no factual explanation, legal rationale, or policy basis for the increased penalty; and
- Was imposed without notice, hearing, or any opportunity for Plaintiff to contest the change.

The timing, severity, and complete absence of due process strongly support an inference of both retaliatory motive and procedural bad faith. Defendants—including Drs. Yang, Holmes, Barnard, Rosenthal, Kluck, and Simmons—either directly imposed these measures, ratified them despite obvious defects, or failed in their duty to correct them.

## 5. Provisional Status Classification Lacked Due Process

The downgrade from "full" to "provisional" status implicated Plaintiff's constitutionally protected property interests in continued enrollment, tuition remission, and assistantship funding, as well as liberty interests in his academic reputation. *Dixon v. Ala. State Bd. of Educ., 294 F.2d 150, 157–58 (5th Cir. 1961); Goss v. Lopez, 419 U.S. 565, 579 (1975).* Far from a symbolic designation, the reclassification immediately terminated Plaintiff's stipend, tuition remission, and health insurance, while rendering him ineligible to maintain lawful F-1 visa status. In practical effect, the action amounted to constructive expulsion, triggering the highest level of procedural protection under established due process jurisprudence. That no such process was afforded underscores both the arbitrariness of the sanction and its retaliatory character.

19

Such deprivations may not be imposed without fair procedures, including notice of the grounds, disclosure of evidence, and an opportunity to be heard before an impartial decisionmaker. *Dixon, 294 F.2d at 158; Goss, 419 U.S. at 579*. None of those safeguards were provided here. Moreover, because the sanction was not the product of genuine academic judgment but instead rested on the deliberate repurposing and misuse of a non-evaluative mentoring tool (the Abilities Transcript) into a punitive device, it falls outside the protection of academic deference recognized in *Bd. of Curators v. Horowitz, 435 U.S. 78, 85 (1978)*, and *Regents of Univ. of Mich. v. Ewing, 474 U.S. 214, 225 (1985)*. In short, Defendants effected a constructive expulsion through arbitrary and retaliatory means, without affording even the "rudimentary elements of fair play" the Fourteenth Amendment requires.

## 6. Absence of an Impartial Decision Maker

Due process requires not only notice and an opportunity to be heard, but also adjudication before a neutral and impartial decisionmaker. *Withrow v. Larkin, 421 U.S. 35, 46–47 (1975)*; *Dixon v. Alabama State Board of Education, 294 F.2d 150, 158 (5th Cir. 1961)*. A proceeding is constitutionally defective when administrators presume guilt or predetermine the outcome—circumstances that eliminate the very fairness the Due Process Clause is designed to secure.

Here, during the supposed "appeal" period, Assistant Provost Dr. Jennifer Simmons expressly prejudged the matter, warning Plaintiff that "repeating the offense could result in increased punishment." This statement assumed guilt in advance and threatened harsher sanctions irrespective of the outcome. Such prejudgment destroyed any appearance of neutrality, in direct violation of the requirement for an impartial decisionmaker under *Withrow and Dixon*. It also chilled Plaintiff's ability to advocate for himself or pursue further protected complaints,

20

compounding the constitutional defect. Accordingly, the process was constitutionally void from inception.

Compounding the defect, Assistant Provost Dr. Jennifer Simmons sought to retroactively legitimize a procedurally void process by inviting Plaintiff to treat his July 7 rebuttal as an "appeal"—even though no valid disciplinary case had ever been initiated under University rules. This maneuver was intended to create the appearance of procedural compliance where none existed and legitimize departmental actions that were procedurally void and constitutionally infirm from inception.

Courts consistently hold that due process is violated when decision-makers are biased, conflicted, or predisposed against the accused. *Withrow v. Larkin, 421 U.S. 35, 47 (1975).* By presuming Plaintiff's guilt and ratifying predetermined outcomes, senior administrators here converted what should have been a safeguard into a mere rubber stamp—stripping Plaintiff of one of the core guarantees of procedural fairness secured by the Fourteenth Amendment.

## D. Stigma-Plus Due Process Violation

Defendants' conduct also constitutes a distinct "stigma-plus" violation of due process. This doctrine applies when the government not only imposes a false and stigmatizing label but also couples that stigma with a tangible deprivation of liberty or property. *Paul v. Davis, 424 U.S. 693, 710–12 (1976).*

On June 30, 2025, Defendants branded Plaintiff as "disruptive" in a disciplinary memorandum recommending probation (Exhibit. H). The accusation was vague, unsubstantiated, and reputationally damaging—particularly in a doctoral program where professionalism is central to academic and career advancement. This was not a passing comment: the label was entered into

Plaintiff's official record, circulated among third-parties, and expressly invoked as the basis for escalating sanctions.

The stigma was directly coupled with concrete deprivations, including:

- Jeopardy to academic standing and degree progress;

- Loss of Graduate Assistantship funding, tuition remission, and health insurance;

- Downgrade to provisional status and permanent stigma in academic record;

- Threats to lawful F-1 immigration status and continued presence in the United States;

- Lasting damage to professional reputation and career prospects;

- Exacerbation of Plaintiff's disability, causing psychological harm and chilling effect; and

- Risk to the jurisdiction of this Court, as loss of visa status would impair Plaintiff's ability to litigate his claims.

These combined harms squarely satisfy the stigma-plus doctrine: reputational injury tethered to significant deprivations of property and liberty interests. See *Doe v. Purdue Univ., 928 F.3d 652, 661–63 (7th Cir. 2019)* (holding that a false disciplinary label coupled with suspension and reputational harm states a stigma-plus claim).

By affixing an unsubstantiated and stigmatizing label as the foundation for life-altering sanctions, Defendants violated Plaintiff's clearly established due process rights. This constitutes an independent constitutional injury under the Fourteenth Amendment, actionable through *42 U.S.C. § 1983*.

### E. Substantive Due Process (Arbitrary and Capricious Sanctions)

The Fourteenth Amendment protects students not only from procedural defects but also from arbitrary, bad-faith, or conscience-shocking misconduct by state actors. Substantive due process is

violated when sanctions reflect "such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment." *Regents of Univ. of Mich. v. Ewing, 474 U.S. 214, 225 (1985)*; *Bd. of Curators v. Horowitz, 435 U.S. 78, 85 (1978)*. It likewise prohibits government action so unjustifiable that it "shocks the conscience." *County of Sacramento v. Lewis, 523 U.S. 833, 846–47 (1998)*.

Defendants' actions here were not careful or deliberative academic judgments. They were arbitrary reprisals imposed in bad faith, divorced from legitimate evaluation, and extreme in their consequences:

**1. Fabricated and Shifting Bases.**

On June 30, Defendants cited Plaintiff's alleged non-submission of an "Abilities Transcript" ("AT")—a tool expressly designated as developmental and non-evaluative—as the basis for threatened reclassification to provisional status. On August 21, 2025, Dr. Barnard—without addressing Plaintiff's detailed rebuttals—issued a memorandum to Dean Annette Kluck formally recommending such reclassification. That memorandum introduced new and expanded requirements that had never been previously identified, a post hoc effort to manufacture an "academic deficiency" and retroactively justify the disproportionate sanction. This "moving target" approach—untethered to any documented academic deficiencies—confirms that the sanctions were pretextual and retaliatory, not the product of professional academic judgment.

**2. Grossly Disproportionate Penalties.**

Even if the Abilities Transcript ("AT") could somehow be reclassified as evaluative—which it cannot—the penalties imposed were grossly disproportionate. For an alleged paperwork lapse, Defendants terminated Plaintiff's stipend, tuition remission, health insurance, and visa eligibility,

23

effectively expelling him from both his program and the United States. Such life-altering sanctions for a minor or pretextual issue bear no rational relationship to any legitimate academic purpose. Punishing Plaintiff with consequences tantamount to expulsion for a non-evaluative mentoring tool exemplifies arbitrary, capricious, and conscience-shocking misconduct. See *Ewing, 474 U.S. at 225*.

### 3. Targeting a Visa-Dependent Student.

Defendants acted with full knowledge that Plaintiff, as an F-1 visa holder, was legally barred from outside employment and relied exclusively on his Graduate Research Assistantship for lawful income, tuition remission, health insurance, and visa eligibility. By terminating the assistantship and reclassifying him to provisional status, Defendants deliberately severed Plaintiff's only lawful means of subsistence and rendered him unable to remain in the United States. Courts recognize that where state actors knowingly impose sanctions that extinguish a student's lawful immigration status, the consequences are per se disproportionate and conscience-shocking, because they extend beyond academics to legal residence, livelihood, and even access to the courts. For an international student, the deprivation of educational status is uniquely severe: it jeopardizes not only degree progress but also the legal right to live and work in the country.

### Conclusion.

The sanctions imposed here amounted to constructive expulsion: termination of enrollment, loss of livelihood, deprivation of health insurance, reputational stigma, and imminent jeopardy to lawful immigration status. Defendants' deliberate repurposing and misuse of a non-evaluative mentoring instrument as a tool for disproportionate sanctions, their shifting and post hoc rationales, the retaliatory timing of escalating sanctions, and their deliberate targeting of Plaintiff's unique

vulnerability as a visa-dependent student together constitute a substantial departure from accepted academic norms, demonstrating that no professional judgment was exercised. These extraordinary collateral consequences amplify the arbitrariness of Defendants' actions and place them squarely within the category of conscience-shocking misconduct that the Fourteenth Amendment forbids. See *County of Sacramento v. Lewis, 523 U.S. 833, 846–47 (1998)*.

### F. Breach of Contract Under Mississippi Law

Mississippi law is settled that "the student-university relationship is contractual in nature." *Univ. of Miss. Med. Ctr. v. Hughes, 765 So. 2d 528, 534 (Miss. 2000)*. The terms of that contract arise from the University's official publications, handbooks, departmental policies, and appointment letters, which together create enforceable obligations governing examinations, assistantships, and disciplinary procedures. While universities retain discretion in matters of genuine academic judgment, they may not ignore their own rules or exercise discretion in bad faith.

### 1. Comprehensive Examination Procedures

Departmental policy required that comprehensive examinations be developed by a three-member faculty committee familiar with the student's academic interests. Plaintiff relied on this safeguard to ensure fairness and validity. Defendants, however, departed from this requirement, relegating familiar faculty to post hoc review rather than actual exam development (Exhibit. E). This deviation materially breached the University's contractual obligation to provide a fair and policy-compliant evaluation.

### 2. Probation and Disciplinary Process

The University of Mississippi's M Book establishes mandatory safeguards before disciplinary probation may be imposed. Specifically, academic discipline requires: (a) a documented discussion

between the initiating faculty member and the student (M Book, p. 11); (b) a written report identifying the factual basis and supporting evidence (M Book, p. 12); and (c) notification of the student's right to appeal only after these steps are satisfied.

Defendants disregarded each of these requirements. No pre-disciplinary meeting was held with Plaintiff. No written report describing the alleged "disruption" or providing supporting evidence was produced. An appeal process was initiated, absent these foundational prerequisites. The probation sanction was therefore procedurally void from inception and imposed in direct violation of binding University policy.

Mississippi courts hold that universities are contractually bound by their published policies, and failure to follow them constitutes a material breach. *Univ. of Miss. Med. Ctr. v. Hughes, 765 So. 2d 528, 534–35 (Miss. 2000)*. By branding Plaintiff "disruptive" and placing him on probation without adhering to these safeguards, Defendants not only breached the University's contractual obligations but inflicted reputational stigma and created the foundation for escalated sanctions—deprivations that Mississippi law recognizes as materially unfair and actionable.

### 3. Graduate Assistantship Renewal

Plaintiff's Graduate Research Assistantship appointment letters created an enforceable contractual expectation of renewal absent one of three legitimate grounds: (a) documented performance deficiencies, (b) elimination of funding, or (c) programmatic need. Mississippi courts recognize that assistantship letters, handbooks, and related policies constitute binding contractual terms governing the student-university relationship. *Univ. of Miss. Med. Ctr. v. Hughes, 765 So. 2d 528, 534–35 (Miss. 2000)*.

26

Defendants terminated Plaintiff's assistantship effective August 15, 2025 (Exhibit. I), without citing any of these valid bases. No performance deficiencies were documented, no funding shortfall was identified, and no programmatic need was advanced. Instead, the termination was justified only by vague reference to a "faculty decision"—a rationale wholly untethered to the contractual terms that governed the appointment.

By disregarding the express renewal provisions and substituting an arbitrary explanation, Defendants breached both the written contract and the implied covenant of good faith and fair dealing, which Mississippi law requires in every contract. *Cenac v. Murry, 609 So. 2d 1257, 1272 (Miss. 1992).*

The impact of this breach was particularly severe. Plaintiff's assistantship provided not only financial compensation but also tuition remission, health insurance, and the sole lawful basis for maintaining F-1 visa eligibility. As an international student legally barred from outside employment, Plaintiff was entirely dependent on the assistantship for food, rent, and medical care. By terminating the appointment without cause, Defendants deprived Plaintiff of the very benefits at the heart of the educational contract, while knowingly placing his lawful immigration status in jeopardy.

### 4. Misuse of the Abilities Transcript

The Abilities Transcript ("AT") is expressly defined by University policy as a developmental mentoring tool, not an evaluative or disciplinary requirement. Nevertheless, Defendants reclassified Plaintiff to provisional status for alleged "non-submission" of the AT and compounded the sanction by imposing fabricated conditions—including weekly advisor meetings, draft

submissions, and mandatory workshops—none of which are authorized by any published policy. (Exhibit. Z3).

This misuse of the AT represents a material breach of the University's contractual obligation to apply its policies as written and in good faith. By weaponizing a developmental resource for punitive purposes, Defendants converted a mentoring tool into a disciplinary device, depriving Plaintiff of the contractual protections of consistency, fairness, and adherence to published rules. Mississippi law makes clear that universities are bound by their own policies, and failure to follow them constitutes a breach of contract. *Univ. of Miss. Med. Ctr. v. Hughes, 765 So. 2d 528, 534– 35 (Miss. 2000)*.

**Conclusion.**

Defendants' conduct reflects a series of material contractual breaches: ignoring examination policies, bypassing mandatory probation safeguards, terminating Plaintiff's assistantship without cause, and fabricating requirements outside of any published rules. Mississippi law is clear that universities are contractually bound by their own policies and publications. *Univ. of Miss. Med. Ctr. v. Hughes, 765 So. 2d 528, 534–35 (Miss. 2000)*. Further, every contract under Mississippi law carries an implied covenant of good faith and fair dealing, which Defendants violated by wielding discretionary authority in bad faith and for retaliatory purposes. *Cenac v. Murry, 609 So. 2d 1257, 1272 (Miss. 1992)*.

Plaintiff is therefore substantially likely to prevail on his breach-of-contract claim. Defendants' reliance on "academic discretion" or "at-will" defenses cannot shield their wholesale disregard of binding policies and good-faith obligations.

### G. Cumulative Likelihood of Success

Even if Defendants were to contest any single theory of liability, Plaintiff asserts multiple, independent bases for recovery:

- **Failure to Accommodate.** Violations of Title II of the ADA and § 504 of the Rehabilitation Act for categorical denials of reasonable accommodations and failure to engage in the legally mandated interactive process. *Cadena v. El Paso County, 946 F.3d 717, 724–25 (5th Cir. 2020).*

- **Retaliation.** Retaliation under the ADA, § 504, and the First Amendment, supported by temporal proximity, escalating sanctions, and pretextual justifications. *Feist v. La. Dep't of Justice, 730 F.3d 450, 454 (5th Cir. 2013); Burlington N. & Santa Fe Ry. v. White, 548 U.S. 53, 68 (2006).*

- **Due Process Violations.** Procedural and substantive due process violations under the Fourteenth Amendment and § 1983, including denial of notice, impartial adjudication, and the imposition of arbitrary sanctions untethered to professional academic judgment. *Dixon v. Ala. State Bd. of Educ., 294 F.2d 150, 158 (5th Cir. 1961); Regents of Univ. of Mich. v. Ewing, 474 U.S. 214, 225 (1985).*

- **Breach of Contract.** State law claims under Mississippi law for failure to follow published procedures, misuse of a non-evaluative mentoring tool as a punitive device, and violation of the implied covenant of good faith and fair dealing. *Univ. of Miss. Med. Ctr. v. Hughes, 765 So. 2d 528, 534–35 (Miss. 2000); Cenac v. Murry, 609 So. 2d 1257, 1272 (Miss. 1992).*

Each theory is substantiated by contemporaneous documentation, Plaintiff's protected activities, and Defendants' own admissions and omissions. The striking temporal proximity of protected

conduct to escalating sanctions—combined with shifting rationales and repeated procedural irregularities—strongly evidences retaliation and administrative bad faith.

Courts recognize that overlapping statutory and constitutional violations are mutually reinforcing and collectively strengthen the showing required under Winter. See ***Opulent Life Church v. City of Holly Springs, 697 F.3d 279, 295 (5th Cir. 2012)*** (noting that where constitutional violations are alleged, the likelihood of success, public interest, and irreparable harm prongs overlap). The same principle applies here: the convergence of multiple, independently sufficient violations produces a cumulative likelihood of success far greater than any single claim standing alone.

Plaintiff thus demonstrates not merely a plausible entitlement to relief, but a compelling likelihood of success across multiple, overlapping legal theories. This cumulative strength fully satisfies the first Winter factor and weighs decisively in favor of immediate judicial intervention to prevent constructive expulsion and irreparable harm.

## II.     Plaintiff Will Suffer Irreparable Injury Without the Injunction

It is well-established that the deprivation of constitutional or civil rights constitutes irreparable harm. The Fifth Circuit has reiterated that "when an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." *Opulent Life Church v. City of Holly Springs, 697 F.3d 279, 295 (5th Cir. 2012)*. The Supreme Court has likewise held that "the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns, 427 U.S. 347, 373 (1976)*. This principle extends to other fundamental rights, including due process and disability protections in education. See *Dixon v. Ala. State Bd. of Educ., 294 F.2d 150, 157 (5th Cir. 1961)* (loss of access to education constitutes irreparable harm).

While the Supreme Court in *Nken v. Holder, 556 U.S. 418, 435 (2009)*, cautioned that removal from the United States is not irreparable in all cases, it acknowledged the "serious burden" imposed by loss of lawful presence. Here, Defendants' actions go further: by stripping Plaintiff of assistantship funding, tuition remission, and full enrollment status, they directly undermine the very conditions required to maintain lawful F-1 visa immigration status. Unlike the generalized "burden of removal" in *Nken*, the intertwined academic, financial, and immigration harms here make constructive expulsion and eventual deportation not speculative but inevitable absent injunctive relief—injuries that no post hoc judgment could cure.

### 1.  Academic Standing and Degree Progress

Courts consistently hold that disruption of a student's academic progress constitutes irreparable harm because "an education once lost is irretrievable." *Dixon v. Ala. State Bd. of Educ., 294 F.2d 150, 157 (5th Cir. 1961)*; see also *Bd. of Curators v. Horowitz, 435 U.S. 78, 91–92 (1978)*. Here,

Defendants' August 5, 2025, escalation of probation—from a one-semester sanction to an indefinite term imposed without any identified deficiencies—together with the August 22 downgrade to provisional status, permanently stains Plaintiff's transcript, stigmatizes his academic record, and jeopardizes timely completion of his Ph.D. These injuries are neither speculative nor remediable; they are immediate, concrete, and enduring. Because lost semesters and stigmatizing notations cannot be erased or compensated after the fact, they represent paradigmatic irreparable harm.

## 2. Graduate Assistantship and Livelihood

The June 30, 2025, termination of Plaintiff's Graduate Research Assistantship eliminated his sole source of income, tuition remission, and health insurance. In the context of a doctoral program, assistantships are not incidental employment; they are the structural foundation that enables students to remain enrolled full-time and progress toward degree completion. Their loss immediately imperils academic standing.

For Plaintiff, the stakes are heightened as an F-1 visa holder. His lawful presence in the United States depends on continuous full-time enrollment and the financial support provided by his assistantship. By terminating that support, Defendants jeopardized not only Plaintiff's education but also his immigration status, placing him at imminent risk of removal. Courts have long recognized that loss of access to education constitutes irreparable injury. *Dixon v. Ala. State Bd. of Educ.*, 294 F.2d 150, 157 (5th Cir. 1961). While the Supreme Court in *Nken v. Holder*, 556 U.S. 418, 435 (2009), cautioned that removal is not irreparable in every case, it nonetheless acknowledged the severe and often unrecoverable burdens associated with loss of lawful presence. Unlike the generalized burden in *Nken*, Defendants here have directly destroyed the very

conditions necessary to maintain Plaintiff's F-1 visa status, making loss of lawful immigration status inevitable, absent immediate injunctive relief.

Defendants' sanctions therefore inflicted immediate and irreparable harm on multiple, interconnected fronts: they eliminated Plaintiff's only source of livelihood, stripped away tuition remission and health insurance, rendered continued full-time enrollment financially impossible, and placed Plaintiff's lawful residence in the United States in imminent jeopardy. Such injuries are paradigmatic examples of irreparable harm because no later damages award can restore lost semesters of education, reinstate visa eligibility, or erase the professional and personal consequences of removal.

### 3. Provisional Status and Academic Record

On August 21–22, 2025, Defendants reclassified Plaintiff to "provisional" status, inserting into his record a false notation of "academic deficiency". Such classifications are not merely administrative; they permanently stain a student's transcript and professional reputation. Courts recognize that stigmatizing academic records inflict lasting reputational injury that no subsequent remedy can erase, constituting irreparable harm. *Doe v. Purdue Univ., 928 F.3d 652, 662–63 (7th Cir. 2019)*.

For Plaintiff, the damage was compounded by the automatic collateral consequences of a "provisional" status. The downgrade immediately terminated his assistantship funding, tuition remission, and health insurance, while simultaneously placing his F-1 visa eligibility in jeopardy. This combination of false stigma and tangible deprivation constitutes precisely the kind of "stigma-plus" injury that courts hold to be paradigmatic irreparable harm. *Paul v. Davis, 424 U.S. 693, 710–12 (1976)*.

33

Critically, the reclassification also threatens this Court's jurisdiction. If Plaintiff is forced to withdraw from his program or loses lawful immigration status, he will be unable to remain in the United States to litigate his claims, participate in discovery, or pursue final relief. Federal courts consistently hold that preliminary injunctive relief is warranted where denial would effectively moot a case by depriving the plaintiff of the ability to prosecute it. *Elrod v. Burns, 427 U.S. 347, 373 (1976)*; *Goss v. Lopez, 419 U.S. 565, 574 (1975)*.

Thus, provisional status inflicts not only irreparable educational and reputational harm, but also undermines the Court's ability to adjudicate this case on the merits absent immediate intervention.

### 4. Immigration Status and Lawful Presence

As an F-1 visa holder, Plaintiff's lawful presence in the United States depends on continuous full-time enrollment and the financial support provided by his Graduate Research Assistantship. By terminating that assistantship, imposing indefinite probation, and reclassifying him to provisional status, Defendants dismantled the very conditions required to maintain visa eligibility.

While the Supreme Court in *Nken v. Holder, 556 U.S. 418, 435 (2009)*, cautioned that removal is not per se irreparable because, in theory, a successful litigant might later be returned, the Court also acknowledged the "serious burden" and practical consequences of removal. Plaintiff's situation goes further: Defendants' actions make loss of lawful status inevitable, not hypothetical. Deportation or forced withdrawal would not merely disrupt his education; it would permanently terminate his doctoral career, sever his professional trajectory, and inflict reputational and personal harms that no damages award could redress.

This immigration-based harm also imperils the Court's jurisdiction. If Plaintiff is forced out of lawful status and compelled to depart the United States, he will be unable to remain within the

34

Court's reach to litigate his claims, participate in discovery, or pursue final relief. Courts consistently hold that injunctive relief is warranted where denial would effectively moot the case by depriving the plaintiff of the ability to prosecute it. *Elrod v. Burns, 427 U.S. 347, 373 (1976)*.

Thus, preserving Plaintiff's lawful presence is essential not only to prevent irreparable harm, but also to ensure this Court retains jurisdiction to adjudicate the merits.

## 5. Professional Reputation and Career Prospects

By branding Plaintiff as "disruptive" and imposing indefinite probation, Defendants inflicted reputational harm that extends far beyond the University. Courts have long held that reputational stigma, when coupled with a tangible deprivation of rights or benefits, implicates a protected liberty interest under the Due Process Clause—the stigma-plus doctrine. *Paul v. Davis, 424 U.S. 693, 710–12 (1976)*; *Doe v. Purdue Univ., 928 F.3d 652, 661–63 (7th Cir. 2019)*.

Here, the stigma was inseparably linked to concrete deprivations: termination of Plaintiff's assistantship, loss of tuition remission and health insurance, and reclassification to provisional status. Together, these measures amounted to constructive expulsion while affixing a false and stigmatizing label to Plaintiff's permanent academic record.

The resulting harm is irreparable. Notations of probation and the "disruptive" label are embedded in Plaintiff's record and will be visible to faculty committees, fellowship boards, and employers. In competitive academic and professional contexts, such stigmatizing entries function as a de facto barrier to advancement, regardless of later judicial vindication. Monetary damages cannot erase these permanent records or restore lost credibility.

The indefinite probation and provisional reclassification also created structural barriers to timely degree completion, compounding the reputational harm. Courts recognize that reputational stigma,

coupled with the loss of educational standing, constitutes irreparable injury because such injuries cannot be undone or adequately compensated by damages. *Dixon v. Ala. State Bd. of Educ., 294 F.2d 150, 157 (5th Cir. 1961).*

Thus, the reputational stigma, coupled with concrete deprivations, establishes both a stigma-plus violation and a paradigmatic form of irreparable harm. Once a doctoral student's record is tainted in this way, the damage to academic trust, professional credibility, and career prospects is permanent and non-compensable.

## 6. Psychological Harm and Chilling Effect

Defendants' escalating sanctions have exacerbated Plaintiff's documented mental health condition, producing severe stress, emotional deterioration, and loss of well-being. Rather than focusing on dissertation progress, Plaintiff has been forced into a state of constant destabilization and survival. The compounded pressures of indefinite probation, termination of funding, and the looming risk of deportation have exacerbated the very condition that gave rise to his accommodation requests.

Courts have long recognized that psychological harm, when coupled with loss of professional identity or denial of protected rights, constitutes irreparable injury. *Chalk v. U.S. Dist. Ct., 840 F.2d 701, 709–10 (9th Cir. 1988).* The Fifth Circuit likewise presumes irreparable harm where constitutional rights are threatened. *Opulent Life Church v. City of Holly Springs, 697 F.3d 279, 295 (5th Cir. 2012); Deerfield Med. Ctr. v. City of Deerfield Beach, 661 F.2d 328, 338 (5th Cir. Unit B 1981).* Here, the sanctions not only intensified Plaintiff's disability but stripped him of his professional identity as a doctoral researcher and assistantship holder—roles essential to his career trajectory.

36

Equally important, the sanctions have a chilling effect on the assertion of federal rights. If left unchecked, they signal to other students that requesting accommodations or raising due process concerns may result in academic and professional sanctions. Courts have emphasized that the chilling of protected activity itself constitutes irreparable harm. *Elrod v. Burns, 427 U.S. 347, 373 (1976).*

In short, Defendants' conduct has produced ongoing psychological deterioration, stripped Plaintiff of professional identity, and deterred the exercise of federally protected rights. These harms are not compensable with monetary damages and independently satisfy the standard for irreparable injury.

## 7. Jurisdiction at Risk

The combined financial, academic, immigration, reputational, and health consequences imposed on Plaintiff amount to constructive expulsion and create cumulative, irreparable injuries that no later legal or monetary relief could cure. Absent immediate intervention, Plaintiff's educational trajectory, lawful immigration status, and professional future will be permanently lost.

Preliminary injunctive relief is necessary not only to preserve Plaintiff's education, but also to preserve this Court's jurisdiction. Without intervention, Defendants' actions will extinguish Plaintiff's assistantship, tuition remission, and health insurance, thereby terminating his F-1 visa eligibility. Once Plaintiff loses lawful presence, he will be compelled to depart the United States— making it impossible for him to prosecute his claims, participate in discovery, or appear for hearings.

Federal courts have long held that preliminary relief is warranted where denial would effectively moot a case by depriving a plaintiff of the ability to litigate. *Elrod v. Burns, 427 U.S. 347, 373*

37

*(1976)* ("The loss of constitutional freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."); *Goss v. Lopez, 419 U.S. 565, 574 (1975)* (exclusion from school irreparably deprives a student of rights). Unlike the removal context in *Nken v. Holder, 556 U.S. 418, 435 (2009)*—where the Court noted that deportation does not invariably preclude judicial relief—here Defendants' sanctions affirmatively dismantle the conditions of lawful status, ensuring Plaintiff's expulsion from both his program and the country. The result is not a speculative burden, but certain mootness absent immediate judicial intervention.

This is not a matter of timing; it is a matter of jurisdiction. Absent relief, Plaintiff will be rendered unable to remain in the United States, mooting the case and stripping this Court of Article III authority to adjudicate the merits. Only a preliminary injunction can preserve a live controversy and ensure that Plaintiff's federal statutory and constitutional rights remain enforceable.

**Summary of Irreparable Harm**

Plaintiff's injuries are immediate, compounding, and not compensable through monetary damages. Indefinite probation, termination of his Graduate Research Assistantship, reclassification to provisional status, jeopardy to his F-1 visa status, reputational stigma, and the aggravation of his documented disability each independently establish irreparable harm under the second *Winter* factor.

Considered cumulatively, these sanctions amount to constructive expulsion, stripping Plaintiff of the ability to complete his doctoral program, maintain lawful presence in the United States, and preserve his professional reputation. Each day without relief inflicts permanent academic, financial, immigration, and psychological consequences that no later judgment can remedy.

Only injunctive relief can prevent these irreversible losses. The record therefore demonstrates that the irreparable harm factor weighs decisively in favor of granting preliminary injunctive relief.

### III.    The Balance of Equities Strongly Favors Plaintiff

The third Winter factor—the balance of equities—overwhelmingly favors Plaintiff. Granting the injunction would require only modest, administrative adjustments by the University, while denying it would impose catastrophic, irreversible, and life-altering harm on Plaintiff.

### 1.    Preserving the Status Quo

The relief Plaintiff seeks is both narrowly tailored and restorative. It would return him to the position he lawfully held before June 30, 2025: full academic standing with assistantship funding, tuition remission, and health insurance. This is the "last peaceable status quo" that preliminary injunctions are designed to protect. *Canal Auth. of State of Fla. v. Callaway, 489 F.2d 567, 576 (5th Cir. 1974).*

The injunction would not require the University to waive academic standards, alter curricula, or fundamentally change institutional policies. It would simply pause enforcement of disputed sanctions until their legality can be adjudicated. For the University, compliance would mean only administrative reinstatement of benefits and recognition of Plaintiff's prior standing. For Plaintiff, by contrast, denial of relief would mean constructive expulsion, loss of lawful immigration status, and irreparable damage to his academic and professional future.

### 2.    No Cognizable Harm to the University

Defendants may argue that interim relief interferes with academic autonomy or departmental governance. But generalized appeals to "institutional autonomy" cannot outweigh specific, demonstrated violations of federal law. As the Fifth Circuit has made clear, a public university "has no legitimate interest in enforcing an unlawful policy." *Janvey v. Alguire, 647 F.3d 585, 600 (5th Cir. 2011).*

At most, compliance would require minor administrative tasks—such as reinstating Plaintiff's stipend, restoring tuition remission, or adjusting enrollment records. These are routine functions that impose minimal burden on the University.

Nor would the injunction intrude upon legitimate faculty prerogatives. Professors would retain full discretion to evaluate Plaintiff's coursework, research, and dissertation under established academic standards. The injunction would merely prohibit the enforcement of sanctions imposed in violation of federal law and due process.

In short, the University suffers no cognizable injury from being required to follow the law, whereas Plaintiff faces constructive expulsion, loss of lawful immigration status, and permanent reputational stigma if injunctive relief is denied.

### 3. Overwhelming Harm to Plaintiff if Denied

By contrast, denial of injunctive relief exposes Plaintiff to immediate, concrete, and irreversible harms that no later remedy can cure:

- **Loss of Assistantship Funding**. Plaintiff's Graduate Research Assistantship provided his only source of income, tuition remission, and health insurance. Its termination renders him financially incapable of maintaining full-time enrollment—a prerequisite for both degree progress and lawful immigration status.

- **Indefinite Probation**. The imposition of indefinite probation permanently stains Plaintiff's academic record with a false mark of academic deficiency, impairing academic advancement and professional opportunities long after this litigation concludes.

- **Immigration Consequences**. Plaintiff's F-1 visa depends on continuous full-time enrollment and institutional support. Without relief, he faces imminent loss of lawful status and removal from the United States.

- **Professional Reputation**. The stigmatizing "disruptive" label and provisional reclassification inflict lasting reputational injury in a field where collegiality and professionalism are central. No damages award can erase these permanent record entries or restore lost opportunities for fellowships, references, and employment.

These harms are not speculative; they are already unfolding and will continue to compound without judicial intervention. Collectively, they amount to constructive expulsion from Plaintiff's doctoral program, with cascading consequences to his education, livelihood, immigration status, and professional future.

## 4. Equities Tilt Decisively Toward Plaintiff

The balance of equities is not close. Granting injunctive relief requires only modest administrative steps—restoring Plaintiff's assistantship, tuition remission, health insurance, and academic standing—so that he may remain enrolled while this case is adjudicated. By contrast, denying injunctive relief results in constructive expulsion, loss of lawful immigration status, permanent stigma on Plaintiff's record, and irretrievable damage to his academic and professional future.

As the Fifth Circuit recognized, injunctions may be essential to prevent "the irretrievable loss of an education." *Dixon v. Ala. State Bd. of Educ., 294 F.2d 150, 157 (5th Cir. 1961)*. That principle applies with even greater force here, where the sanctions threaten not only Plaintiff's education but his lawful presence in the United States.

42

Defendants suffer no legally cognizable injury from being required to comply with federal law and their own published procedures. Plaintiff, by contrast, faces life-altering harms—academic, financial, reputational, and immigration-related—that no damages award could remedy.

The equities, therefore, tip not merely in Plaintiff's favor, but overwhelmingly so. The balance of hardships compels the issuance of preliminary injunctive relief.

## IV.  The Public Interest Compels Granting the Injunction

Granting preliminary injunctive relief here serves far more than Plaintiff's private interests; it vindicates the public's compelling stake in the enforcement of federal civil rights statutes, the protection of constitutional guarantees, and the preservation of integrity in higher education.

### 1. Enforcement of Federal Disability Law.

Congress enacted the ADA and § 504 of the Rehabilitation Act to guarantee individuals with disabilities "meaningful access" to public programs, including higher education. *Tennessee v. Lane, 541 U.S. 509, 531–32 (2004)*. Courts consistently recognize that the public interest is served when these protections are enforced. *Henrietta D. v. Bloomberg, 331 F.3d 261, 287 (2d Cir. 2003)*. Ordering Defendants to reinstate Plaintiff and honor his accommodation rights would not only restore his individual access, but also reinforce for the broader student body that disability protections are substantive, enforceable, and immune from retaliation.

### 2. Protection of Constitutional Guarantees.

The Supreme Court has recognized that "there is the highest public interest in the due observance of all the constitutional guarantees." *Elrod v. Burns, 427 U.S. 347, 373 (1976)*. The Fifth Circuit likewise holds that "it is always in the public interest to prevent the violation of a party's constitutional rights." *Opulent Life Church v. City of Holly Springs, 697 F.3d 279, 295 (5th Cir. 2012)*. Plaintiff has demonstrated likely violations of both due process and First Amendment protections. Enjoining a state university from perpetuating such ongoing constitutional deprivations directly advances the public good by reinforcing the rule of law and ensuring that publicly funded institutions remain accountable to constitutional limits.

### 3. Safeguarding Fairness in Higher Education.

44

Equal access to higher education is not merely a private concern—it is a national policy priority embodied in the ADA and § 504 of the Rehabilitation Act. Congress prohibited retaliation precisely because unchecked reprisals deter students from exercising their constitutional rights. If universities are permitted to punish students for requesting accommodations, raising procedural concerns, or reporting policy violations, the chilling effect extends far beyond the individual Plaintiff and undermines the rights of the entire student body. Preventing such chilling effects protects both Plaintiff and similarly situated students, while reinforcing public confidence in the fairness and integrity of higher education.

## 4. Academic Autonomy and Legal Compliance.

Defendants may argue that principles of academic autonomy weigh against judicial intervention. But academic discretion is not limitless. Courts extend deference only to good-faith judgments concerning academic performance; they do not defer when universities impose pretextual or retaliatory sanctions in disregard of statutory mandates or constitutional protections. See *Doe v. Univ. of Cincinnati, 872 F.3d 393, 401–02 (6th Cir. 2017)*. Here, Defendants misused the "Abilities Transcript"—a mentoring tool expressly defined as developmental and non-evaluative—as a punitive device, and branded Plaintiff "disruptive" without notice, evidence, hearing, or a factual description of the alleged conduct with sufficient specificity to allow a meaningful opportunity to respond. Enjoining such conduct does not intrude upon legitimate academic prerogatives; it ensures that those prerogatives are exercised within lawful bounds.

## 5. Broader Societal and Public Policy Interest.

The public has no legitimate interest in allowing a state university to persist in unlawful discrimination or retaliation. To the contrary, the public benefits when courts hold public

45

institutions accountable to civil rights mandates. As the Ninth Circuit observed, "our society as a whole suffers when we neglect the poor, the hungry, the disabled, or when we deprive them of their rights or privileges." *Golden Gate Restaurant Ass'n v. City & County of San Francisco, 512 F.3d 1112 (9th Cir. 2008)*. Enforcing protections against disability discrimination and retaliation not only secures Plaintiff's individual rights but also reinforces broader societal commitments to equality, fairness, and accountability. Upholding these principles preserves public confidence in the integrity of higher education and affirms that federally funded institutions must operate within the rule of law.

**Conclusion.**

The public interest is best served by enforcing federal disability protections, safeguarding constitutional guarantees, and preserving equal access to higher education. Defendants can identify no legitimate public interest in persisting with conduct that is likely unlawful. To the contrary, the Fifth Circuit has made clear that "the public interest is served when constitutional rights are protected." *Valentine v. Collier, 956 F.3d 797, 803 (5th Cir. 2020)*. Granting preliminary relief here not only vindicates Plaintiff's rights under the ADA, § 504 of the Rehabilitation Act, and the Constitution, but also affirms the broader societal commitment to fairness, accountability, and the rule of law in public education.

## V. Anticipated Defenses Fail

Defendants may attempt to avoid judicial review through a series of doctrinal defenses. None withstand scrutiny.

### 1. Sovereign Immunity

Defendants may invoke Eleventh Amendment immunity, but that defense fails on three independent grounds:

- **Waiver by Federal Funding**. By accepting federal funds, the University waived immunity to claims under § 504 of the Rehabilitation Act. *Univ. of Ala. v. Garrett, 531 U.S. 356, 374 n.9 (2001)*.

- **Congressional Abrogation**. Congress validly abrogated state sovereign immunity under Title II of the ADA, particularly where fundamental rights, such as access to public education, are implicated. *Tennessee v. Lane, 541 U.S. 509, 533–34 (2004)*.

- **Ex parte Young Doctrine**. Plaintiff seeks only prospective injunctive relief—reinstatement and cessation of ongoing statutory violations—against state officials in their official capacities. Such forward-looking relief is squarely permitted under *Ex parte Young, 209 U.S. 123 (1908)*.

Because Plaintiff does not seek retroactive damages from the state treasury, but compliance with federal law going forward, the Eleventh Amendment poses no barrier to this action.

### 2. Qualified Immunity

The individual Defendants cannot shield themselves with qualified immunity. The doctrine protects officials only where their conduct does not violate "clearly established" rights of which a reasonable person would have known. *Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)*. For decades, it has been clearly established that:

- **Right to Accommodations**. Students with disabilities are entitled to reasonable modifications to ensure meaningful access to education. *Southeastern Cmty. Coll. v. Davis, 442 U.S. 397 (1979).*

- **Right to Due Process**. Students at public universities have recognized property and liberty interests in continued enrollment, financial aid, and academic reputation, which may not be removed without notice and a meaningful opportunity to be heard. *Goss v. Lopez, 419 U.S. 565, 579 (1975); Bd. of Curators v. Horowitz, 435 U.S. 78, 85–86 (1978).*

No reasonable university official could have believed it lawful to categorically deny accommodation requests, brand a student "disruptive" without notice or evidence, impose indefinite probation without hearing, or terminate a graduate assistantship absent cause. These actions strike at the heart of protections long recognized by the Supreme Court.

Qualified immunity does not shield state officials who ignore established disability protections, deprive students of due process, or retaliate against the exercise of federally protected rights. Because the Defendants' conduct falls squarely within that category, qualified immunity is unavailable.

## 3. Administrative Sanctions vs. Academic Judgment

The measures imposed on Plaintiff were not legitimate evaluations of his scholarship, research, or academic competence. They were administrative reprisals imposed in direct temporal proximity to his protected activities, including his requests for accommodations and due process.

The Supreme Court has consistently distinguished between genuine academic judgments, which warrant judicial deference, and disciplinary or retaliatory actions, which do not. *Bd. of Curators v. Horowitz, 435 U.S. 78, 85–86 (1978); Regents of Univ. of Mich. v. Ewing, 474 U.S. 214, 225*

*(1985)*. Deference applies only where faculty exercise "careful and deliberate" professional judgment about academic performance—not when sanctions are untethered to scholarship and imposed for administrative or punitive reasons.

Courts have emphasized that universities may not cloak retaliation or procedural violations in the guise of academic discretion. See ***Doe v. Univ. of Cincinnati, 872 F.3d 393, 401–02 (6th Cir. 2017)*** (rejecting deference where a university imposed discipline without fair process). Here, the sanctions imposed—indefinite probation, termination of Plaintiff's Graduate Research Assistantship, and reclassification to provisional status—were not authentic judgments about academic quality. They were administrative acts wielded as punitive tools in direct response to Plaintiff's assertion of rights.

When sanctions arise not from academic assessment but from retaliation or administrative misuse of authority, judicial deference evaporates. Federal courts not only may, but must, intervene to prevent public universities from abusing their authority in violation of statutory and constitutional guarantees.

### 4. Academic Deference

Defendants may argue that their actions are insulated by judicial deference to academic judgment. That defense fails. Courts extend deference only to bona fide evaluations of academic performance—not to disciplinary or retaliatory measures masquerading as academic decisions.

- **Scholastic Assessments vs. Discipline**. Deference applies to judgments about academic competence, such as grades or dissertation quality—not to sanctions imposed for alleged and false misconduct, administrative convenience, or retaliation. ***Powell v. Syracuse Univ., 580 F.2d 1150, 1153 (2d Cir. 1978)***.

49

- **Violations of Rules or Law**. When universities disregard their own procedures or statutory mandates, judicial oversight is required. *Doe v. Univ. of Cincinnati, 872 F.3d 393, 401–02 (6th Cir. 2017)*.

- **Discrimination Not Protected**. "Academic freedom does not include the freedom to discriminate." *Zahorik v. Cornell Univ., 729 F.2d 85, 92 (2d Cir. 1984)*. Universities may not invoke "academic judgment" to shield unlawful conduct.

Here, branding Plaintiff as "disruptive" without notice or evidence, and weaponizing the Abilities Transcript—a mentoring tool expressly defined as non-evaluative—were not academic evaluations. They were administrative reprisals, imposed in temporal proximity to Plaintiff's protected activity.

The Supreme Court itself has drawn this line. In *Bd. of Curators v. Horowitz, 435 U.S. 78, 85–86 (1978)*, and *Regents of Univ. of Mich. v. Ewing, 474 U.S. 214, 225 (1985)*, the Court held that deference applies only where decisions reflect "careful and deliberate" professional judgment. When sanctions represent "a substantial departure from accepted academic norms" such that professional judgment was not actually exercised, deference does not apply.

Defendants' shifting rationales, retaliatory timing, and disregard of binding policy demonstrate arbitrary administrative punishment—not genuine academic discretion. Academic deference, therefore, provides no shield against judicial review.

## 5. At-Will Employment

Defendants may contend that Plaintiff's Graduate Research Assistantship was terminable "at will." Mississippi law forecloses that defense.

- **McArn Public Policy Exception**. Mississippi recognizes an exception to at-will termination where an employee—or student assistant—is discharged for refusing to engage in unlawful acts or for asserting statutory rights. *McArn v. Allied Bruce-Terminix Co., 626 So. 2d 603, 607 (Miss. 1993)*. Plaintiff's termination followed directly from his assertion of rights under the ADA, § 504 of the Rehabilitation Act, and the Constitution, placing it squarely within this public-policy exception.

- **Hughes Binding Precedent**. In *Univ. of Miss. Med. Ctr. v. Hughes*, the Mississippi Supreme Court rejected the argument that university discretion over academic or funding matters eliminates contractual obligations. *765 So. 2d 528, 534–35 (Miss. 2000)*. The Court held that official handbooks, policies, and appointment letters form enforceable contracts, and deviation from them constitutes breach. Plaintiff's assistantship was governed by precisely such documents, which guaranteed renewal absent cause, funding shortfall, or programmatic need.

- **Implied Covenant of Good Faith**. Even where contracts provide administrators discretion, Mississippi courts enforce the implied covenant of good faith and fair dealing to prevent abuse. *Cenac v. Murry, 609 So. 2d 1257, 1272 (Miss. 1992)*. Here, discretionary powers over assistantship renewal were wielded not for legitimate educational purposes, but to punish Plaintiff for engaging in protected activity—an abuse the covenant forbids.

Accordingly, Defendants cannot rely on "at-will" employment as a shield. Plaintiff's assistantship was contractually protected by handbooks and appointment letters, and its termination in retaliation for asserting federally protected rights is unlawful under both Mississippi contract law and the state's public-policy exception to at-will employment.

## 6. Failure to Exhaust Administrative Remedies

51

Defendants may argue that Plaintiff was obligated to exhaust internal grievance procedures or pursue OCR proceedings before filing suit. That contention fails.

- **No Exhaustion Requirement**. Neither § 504 of the Rehabilitation Act, Title II of the ADA, nor § 1983 imposes an exhaustion requirement as a prerequisite to federal litigation. *Patsy v. Bd. of Regents, 457 U.S. 496, 516 (1982)*. Congress deliberately structured these statutes to allow immediate judicial recourse when civil rights are violated.

- **Plaintiff's Diligence**. Even if exhaustion were relevant, Plaintiff pursued multiple internal rebuttals and appeals, each of which Defendants disregarded or summarily denied. He also filed a complaint with the U.S. Department of Education's Office for Civil Rights (OCR), underscoring diligence and good faith. The futility of those efforts only confirms the necessity of judicial intervention.

Accordingly, exhaustion presents no bar to this action. Plaintiff has satisfied both the statutory framework and any equitable expectation of diligence. His claims are properly before this Court.

In sum, none of the Defendants' anticipated defenses withstand scrutiny. Sovereign immunity has been waived or abrogated; qualified immunity is unavailable where clearly established rights were violated; academic deference does not shield retaliatory or procedurally defective sanctions; Mississippi law forecloses reliance on at-will employment where termination contravenes public policy; and exhaustion of administrative remedies is not required. Collectively, these failures confirm that Plaintiff's claims are properly before this Court and that judicial intervention is both lawful and necessary to halt ongoing violations of federal rights.

## PRAYER FOR RELIEF

For the reasons stated above, Plaintiff respectfully requests that this Court grant a preliminary injunction providing the following relief pending final judgment:

1. **Preservation of Student Status.** Maintain Plaintiff's status as a full-time graduate student in good standing, as of immediately before the adverse actions taken on June 30, 2025.

2. **Preservation of Graduate Assistantship.** Restore and preserve Plaintiff's Graduate Research Assistantship, including all associated stipend, tuition remission, and health benefits, as held prior to June 30, 2025.

3. **Non-Retaliation Mandate.** Enjoin Defendants, their agents, and employees from taking any further retaliatory, coercive, or intimidating actions, including altering Plaintiff's academic status, terminating financial support, or imposing materially adverse actions in response to his protected activity.

4. **Interactive Process Requirement.**

    1. **Acknowledgment of Prior Failures.** Order that Defendants, including Dr. Yi Yang in her capacity as Department Chair, be deemed to have failed to initiate the interactive process required by federal law despite Plaintiff's repeated written requests. Such failures do not constitute compliance with the ADA or Section 504 of the Rehabilitation Act, and post-hoc or belated offers of accommodation cannot cure earlier violations. *Cf. EEOC v. Chevron Phillips Chem. Co., 570 F.3d 606, 621 (5th Cir. 2009).*

    2. **Prospective Compliance.** Order the University of Mississippi, acting through its Student Disability Services (SDS) office and in coordination with relevant administrators, to promptly engage in a good-faith interactive process with Plaintiff to identify and implement reasonable accommodations. Further order that Dr. Yi Yang, in her capacity as Department

Chair, not obstruct, interfere with, or otherwise prevent this process. Require Defendants to comply fully with *Title II of the ADA, 42 U.S.C. § 12132*; *Section 504 of the Rehabilitation Act, 29 U.S.C. § 794*; and implementing regulations, including *28 C.F.R. § 35.130(b)(7) and 34 C.F.R. § 104.44(d)*.

5. **Waiver or Nominal Bond**. Pursuant to *Federal Rule of Civil Procedure 65(c)*, order that the security requirement be waived or, alternatively, set only at a nominal amount of $1. Rule 65(c) requires security solely to protect against costs and damages in the event of a wrongful injunction, and courts have broad discretion to waive or impose only a minimal bond where, as here, the relief sought is equitable, the public interest is served, and Defendants face no cognizable harm. *See Fed. R. Civ. P. 65(c); City of Atlanta v. Metro. Atlanta Rapid Transit Auth., 636 F.2d 1084, 1094 (5th Cir. 1981)*.

## CONCLUSION

Absent immediate injunctive relief, Plaintiff faces constructive expulsion, loss of lawful F-1 status, and permanent harm to his academic and professional future. The harms at issue—loss of enrollment, assistantship funding, health insurance, and visa eligibility—are well-recognized forms of irreparable injury that no later remedy can repair. *See Dixon v. Alabama, 294 F.2d 150, 157 (5th Cir. 1961)* (loss of education is irreparable).

The relief sought does not alter academic standards or confer unearned benefits. It simply preserves the status quo ante—Plaintiff's prior good standing, assistantship, and educational access—pending full adjudication. This is the core function of preliminary injunctive relief under *Fed. R. Civ. P. 65*: to prevent irreparable harm while the Court considers the merits on a complete record. *See Winter v. Nat. Res. Def. Council, 555 U.S. 7, 20 (2008)*.

54

For these reasons, Plaintiff respectfully requests that this Court grant his Motion for Temporary Restraining Order and Motion for Preliminary Injunction, and enter an order restoring the status quo ante until final judgment.

Respectfully submitted,

Omokhodion Alfred Eriakha

Plaintiff, Pro Se

1802 Jackson Avenue West

Oxford, MS 38655

Phone: (662) 281-4676

Email: eriakhab@gmail.com

Date: 08/29/2025

## CERTIFICATE OF SERVICE

I hereby certify that on August 29, 2025, I filed the foregoing Memorandum with the Clerk of Court.

Omokhodion Alfred Eriakha

Plaintiff, Pro Se