# UNITED STATES DISTRICT COURT

for the

Northern District of Mississippi

Oxford Division

**RECEIVED**

OCT 15 2025

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF MISSISSIPPI

| | |
|---|---|
| Omokhodion Alfred Eriakha | Case No.   3:25-cv-00226 |
| *Plaintiff* | |
| -v- | |
| University of Mississippi; Dr. Yi Yang; Dr. Marie Barnard; Dr. Erin Holmes; Dr. Meagen Rosenthal; Dr. Annette Kluck; Dr. Jennifer Simmons | |
| *Defendants* | |

## DECLARATION OF OMOKHODION ALFRED ERIAKHA IN SUPPORT OF

## AMENDED COMPLAINT

1

# I. BACKGROUND

Pursuant to *28 U.S.C. § 1746*, I, Omokhodion Alfred Eriakha, declare under penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief:

1. **Purpose of Declaration**

    I am the Plaintiff in this action, and I respectfully submit this Declaration in support of my Amended Complaint and Request for Injunction. Its purpose is to present the Court with a clear, factual, and accurate account of relevant events and to clarify and supplement the Court's *Memorandum Opinion* dated **September 19, 2025** (*Court's Order, Docket No. 16*).

    This clarification is necessary to ensure that the Court's evaluation proceeds on a complete and accurate record. The facts set forth herein describe ongoing violations of my rights under the **First Amendment**, the **Americans with Disabilities Act** (ADA), **Section 504 of the Rehabilitation Act**, and the **Due Process Clause of the Fourteenth Amendment**.

    All statements herein are based on my personal knowledge and supported by contemporaneous documentary evidence, including true and correct copies of records previously filed on the docket (**see Docket. No. 9**) and additional exhibits attached to this Declaration in support of the Amended Complaint.

2. **Student Status and F-1 Visa Standing**

    I am a doctoral student in the Department of Pharmacy Administration at the University of Mississippi, enrolled under lawful F-1 visa status. Until **June 30, 2025**, I held a Graduate Research Assistantship ("GRA") that provided a stipend, tuition remission, and health insurance. My cumulative GPA of 3.74 reflects strong academic performance. I completed all

required coursework, maintained continuous good standing, and had no deficiencies or disciplinary issues prior to **June 30, 2025**.

For more than four years as a graduate assistant, I consistently received positive faculty evaluations and was never advised of any performance concerns. To the contrary, my contributions were repeatedly commended, including an **April 2025** written acknowledgment specifically praising the quality of my work.

This established record of strong academic and professional standing—together with the absence of any documented deficiencies or discipline prior to **June 30, 2025**—provides essential context for assessing the abrupt and severe sanctions imposed beginning **June 30, 2025**.

*True and correct copies of my **official transcript, diploma, and April 2025 faculty correspondence** are attached as **Exhibits Z6 and Z7**.*

3. **Documented Disability**

I live with a documented mental health disability that substantially limits major life activities. I first disclosed this condition to faculty members, including Dr. Erin Holmes and Dr. Marie Barnard, in **2022**. This condition qualifies as a disability under Section 504 of the Rehabilitation Act and Title II of the Americans with Disabilities Act, entitling me to the protections and accommodations guaranteed by those statutes.

The Court's **September 19, 2025** *Memorandum Opinion* noted that my filings did not specify the nature of my disability (*Docket. 16, p. 1*). That omission was intentional, reflecting an effort to preserve medical privacy, not an oversight. I am prepared to provide supporting medical documentation under seal, or in any manner the Court directs, to confirm my entitlement to ADA and Section 504 protections.

Once a qualifying disability is disclosed, University officials—including faculty and administrators—have an immediate legal duty to engage in the interactive process and provide reasonable accommodations. This duty is not contingent on referral to Student Disability Services (SDS) or disclosure of diagnostic details. Nor can the University avoid its obligations by deferring to SDS; its officers remain independently responsible for compliance with federal disability law.

4. **First Request for Accommodation (Fall 2024)**

In **November 2024**, following my initial comprehensive exam attempt and the Provost's ruling on my appeal, I submitted written requests for reasonable accommodations to Department Chair Dr. Yi Yang, copying Graduate Program Coordinator Dr. Marie Barnard. Specifically, I requested: **(a)** clarification of the competencies the faculty alleged I had not demonstrated, to alleviate the disability-related distress caused by uncertainty regarding those alleged deficiencies; and **(b)** that remediation meetings be conducted virtually or asynchronously, to reduce the severe psychological strain of in-person encounters.

These requests were directly related to my documented disability, were reasonable, and would have imposed no undue burden on the Department. They were intended to ensure my equal access to the remediation process without exacerbating my disability-related anxiety.

*A true and correct copy of this correspondence is attached as **Exhibit Z**.*

5. **Immediate Denial of First Accommodation Request (Failure to Engage in Interactive Process)**

Although my **November 2024** requests were acknowledged by Department Chair Dr. Yi Yang, the University—acting through the Chair—categorically refused to engage in the required interactive process or consider reasonable alternatives. Between **November 12 and 18, 2024,**

4

the Chair repeatedly denied my requests on the stated grounds that granting modifications to one student would not be "equitable" because prior students had not received such accommodations.

At no point was I referred to Student Disability Services (SDS) or connected with disability specialists, despite the University's obligation to facilitate such involvement. These categorical refusals constituted a denial of my first accommodation request. As a result, I was compelled to complete remediation under unmodified conditions, which caused significant psychological distress, exacerbated my disability, and denied me equal access to the program.

*A true and correct copy of this correspondence is attached as **Exhibit Z**.*

6. **Second Accommodation Request (Spring 2025)**

In preparation for my second comprehensive examination—and still without clarification of the competencies the faculty claimed I had not demonstrated—I renewed my requests for disability-related accommodations.

On **April 25, 2025**, after receiving no response to my **November 2024** requests, I independently contacted Student Disability Services (SDS). SDS confirmed that, absent any departmental policy barring accommodations, I could submit my requests directly to the Department, and that once submitted, the Department bore responsibility for responding and determining how to proceed (***Exhibit Z10** – April 25, 2025 correspondence with SDS*).

Relying on this guidance, between **April 28** and **May 9, 2025**, I submitted written requests to Department Chair Dr. Yi Yang, copying additional faculty. I specifically requested either **(a)** *the presence of a neutral observer during the oral examination*, or **(b)** *that the examination be conducted in an open format comparable to a dissertation defense*. These safeguards are

common academic practices, neither novel nor burdensome, and were directly tied to my disability-related anxiety, which had been substantially exacerbated during my first attempt. During my first attempt, the absence of safeguards—*no neutral observer, no recording, and a closed-door format*—left my oral responses vulnerable to mischaracterization. This lack of transparency triggered severe anxiety that compounded my disability-related limitations. As I prepared for my second attempt, I reasonably feared that the same conditions would again result in unfair treatment. My requested accommodations were narrowly tailored to address these concerns, alleviate the psychological strain of the examination setting, and promote fairness through transparency.

*True and correct copies of my **email correspondence with SDS**, my **April 27, 2025 letter to the Department Chair**, and my **April 28–May 9, 2025 correspondence with the Department Chair** are attached as **Exhibits Z10, A, and B**.*

7. **Immediate Denial of Second Accommodation Request (Failure to Engage in Interactive Process)**

My **April–May 2025** requests for reasonable accommodation in advance of the **June 9, 2025** comprehensive examination were categorically denied, without any effort to engage in the interactive process mandated by the ADA and Section 504. On **May 5, 7, and 9, 2025**, Department Chair Dr. Yi Yang stated that the exam would proceed strictly under the Department's "established procedures," providing no modification, no alternative accommodation, and no referral to Student Disability Services (***Exhibit B** – April 28–May 9, 2025 correspondence*).

These denials mirrored the rejection of my **November 2024** request and reflected a continuing pattern of disregard for federal disability mandates and the University's own policies. Even if

6

the Department disagreed with my specific proposals—such as permitting a neutral observer or conducting the oral examination in an open format—it remained legally obligated to engage in the interactive process and consider effective alternatives. Its categorical refusal constituted a direct violation of the ADA and Section 504.

The repeated denial of my requests for reasonable accommodations, coupled with the refusal to clarify the competencies the faculty claimed I had not demonstrated, deprived me of a fair opportunity to prepare for and participate in the examination retake. These actions violated my rights under the ADA, Section 504, and the Fourteenth Amendment's Due Process Clause by denying me equal access, aggravating my disability-related limitations, and intensifying the very anxiety my requested accommodations were designed to mitigate.

Because the accommodation dispute remained unresolved, my comprehensive examination was postponed, delaying completion of a critical program milestone and causing irreparable academic and professional harm. In the same correspondence confirming the postponement, the Department Chair stated that renewal of my assistantship was contingent on faculty recommendation. Given the timing and context, this statement operated as an implied warning that continued pursuit of accommodations and policy compliance could jeopardize my funding. This coercive pressure compounded the denial of accommodations, further undermined the protections guaranteed under the ADA and Section 504, and placed both my livelihood and immigration status at immediate risk.

*True and correct copies of my **April 27, 2025 written request to the Department Chair** and my **April 28–May 9, 2025 correspondence documenting these denials** are attached as **Exhibits A and B**.*

7

8. **Protected Complaints to Senior Administrators Regarding Disability Rights and Policy Violations**

On **April 27, 2025**, I submitted a formal complaint to Department Chair Dr. Yi Yang, explaining that the Department had disregarded the safeguard in the *2024–25 Policies and Procedures Guide* requiring that comprehensive examinations be developed by three faculty members familiar with a student's research interests (***Exhibit Z8** – 2024–25 Policy Guide; **Exhibit A** – April 27, 2025 letter*). I noted that this violation undermined exam fairness and heightened my disability-related distress in preparing for the retake. Rather than addressing the issue or engaging in the required interactive process, Dr. Yang dismissed the complaint and avoided acknowledging the violation in subsequent correspondence (***Exhibit B** – April 28– May 9, 2025 emails*). This failure reflected both a breach of University policy and noncompliance with federal disability law.

Believing that my disability rights were being disregarded and University policies violated, I escalated my concerns in good faith to senior administrators outside the Department:

- **May 9, 2025 Escalations**: I wrote to Provost Dr. Noel Wilkin and Graduate School Dean Dr. Annette Kluck, reporting that the Department had failed to follow required accommodation procedures and was refusing to address my disability-related requests (***Exhibits C and D** – May 9, 2025 emails*). In these communications, I expressly invoked the University's obligations under the ADA and Section 504, placing senior leadership on clear notice of ongoing disability discrimination.

- **May 13, 2025 Follow-Up**: I submitted a further complaint to the Provost detailing the Department's policy violations, denial of accommodations, and conduct I reasonably perceived as coercive and retaliatory (***Exhibits B and D** – May 13, 2025 correspondence*).

8

In that complaint, I again emphasized that the Department's actions implicated federal disability law under the ADA and Section 504, not merely internal procedures.

These good-faith complaints—directed to the University's highest academic officers and grounded in federal disability law and the University's written policies—constituted protected activity under the ADA, Section 504, and the University's grievance and anti-retaliation policies.

*True and correct copies of the 2024–25 Policies and Procedures Guide, my April 27 complaint, related correspondence with the Department Chair, and my escalations to the Dean and Provost are attached as Exhibits Z8, A, B, C, and D.*

9. **Deliberate Indifference and Policy Revision**

On **June 2, 2025**, Graduate School Dean Dr. Annette Kluck issued a letter that, while implicitly acknowledging the validity of my concerns regarding the comprehensive exam process, nevertheless upheld and rationalized the Department's categorical refusal to provide the accommodations I had requested—such as a neutral observer, an open-format examination, or any alternative offered through the required interactive process (***Exhibit E – June 2, 2025 letter***). This response ratified the Department's noncompliance with federal disability law and reflected deliberate indifference to my rights under the ADA and Section 504.

On **June 25, 2025**, after I followed up to seek clarification regarding the Department's compliance with its policy safeguard, Dean Kluck replied, "my conclusions stand" (***Exhibit C – June 25, 2025 correspondence***). This response ratified the Department's failure to comply with the safeguard expressly mandated in the *2024–25 Policies and Procedures Guide* (***Exhibit Z8***) and constituted administrative approval of a due process violation, while undermining the University's own written policies.

9

Later that same month, while my accommodation requests and policy complaints remained pending, the Department revised its Policies and Procedures Guide to remove the safeguard I had invoked. The *2024–25 Guide* required that "*three faculty members familiar with a student's research interests*" develop the examination questions. The *2025–26 Guide*, deleted the requirement of "*three*", leaving only that "*a committee of faculty members*" would develop the questions (*Exhibit Z8 – 2024–25 vs. 2025–26 Policy Guides*). This change eliminated a clear procedural protection and replaced it with a vague, unenforceable standard.

The timing of this revision—made while my accommodation requests and policy complaints were pending—reasonably supports the inference that it was intended to nullify my grievance rather than to serve any legitimate academic purpose. By retroactively removing a safeguard expressly designed to ensure fairness, the University ratified the violation I had identified, deprived me of due process, and obstructed my rights under the ADA and Section 504. This action reflects deliberate indifference to federal disability law and to the University's own written policies.

*True and correct copies of the 2024–25 and 2025–26 Policies and Procedures Guides, Dean Kluck's June 2, 2025 letter, together with correspondence reflecting administrative avoidance and endorsement, are attached as Exhibits Z8, E, B, and C.*

10. **Coordinated Adverse Actions on June 30, 2025**

On **June 30, 2025**—just five days after my follow-up communication to Graduate School Dean Dr. Annette Kluck and other senior officials regarding the unresolved comprehensive exam policy violation—I was subjected to three materially adverse actions, each delivered within minutes of the others:

- A disciplinary memorandum accusing me of "disruption" at a peer's thesis defense and recommending probation (***Exhibit H – June 30, 2025 memorandum***);

- A notice of non-renewal terminating my Graduate Research Assistantship, effective August 15, 2025 (***Exhibit I – June 30, 2025 termination notice***); and

- A memorandum warning that my academic standing could be downgraded to "provisional" status based on the alleged non-submission of an Abilities Transcript (***Exhibit J – June 30, 2025 memorandum***).

These three simultaneous sanctions were unprecedented in my graduate studies and, indeed, in my entire academic experience. Their extraordinary timing—occurring immediately after my protected complaints regarding ADA and Section 504 rights, as well as documented policy violations—cannot reasonably be explained as legitimate academic measures. Instead, the record demonstrates that they were coordinated, retaliatory responses to my protected activity.

*True and correct copies of my **June 25, 2025 follow-up email** and the **three June 30, 2025 adverse memoranda** are attached as **Exhibits C, H, I, and J**.*

11. **Baseless "Disruption" Label and Probation Recommendation**

The first adverse action on **June 30, 2025**, was an interoffice memorandum signed by Drs. Erin Holmes, Marie Barnard, and Meagen Rosenthal, with concurrence from Department Chair Dr. Yi Yang. It alleged that I engaged in "disruption" during a peer's thesis defense on **June 25, 2025**, and recommended probation (***Exhibit H – June 30, 2025 memorandum; Exhibit G – June 30, 2025 email thread***).

**June 30, 2025**, was the first time I became aware of any such allegation. The memorandum identified no specific conduct or remarks, citing only a vague reference to "collegial" behavior under Section 1 of the M Book. It further asserted, without evidence, that my participation

11

undermined the integrity of the academic process and negatively affected peers and the broader scholarly community. In reality, my sole participation consisted of asking academic questions during the Q&A session. Department Chair Dr. Yi Yang was present throughout the defense, yet neither Dr. Yang nor the three faculty members who later signed the memorandum raised any concern at the time or in the days that followed.

The absence of notice contravened the University's own disciplinary safeguards and deprived me of due process. Under the M Book, probation may only be recommended after the following mandatory steps:

1. A documented discussion between the faculty member and the student, affording the student an opportunity to respond (*p. 11*);

2. A written report of the incident, including details of communications with the student and the basis for any recommended sanction (*p. 12*);

3. A statement indicating whether the student accepted or rejected the proposed sanction (*p. 12*); and

4. A right of appeal available only after these preliminary steps are satisfied (*p. 12*) (***Exhibit Z11 – M Book disciplinary procedures***).

Instead of following these required steps, I was abruptly presented with an after-the-fact memorandum that vaguely labeled my academic participation as "disruption," in direct violation of the University's mandatory disciplinary procedures and the basic requirements of due process.

*True and correct copies of the **June 30, 2025 memorandum**, the **supporting email thread**, and the **University's M Book provisions on disciplinary initiation** are attached as **Exhibits H, G, and Z11**.*

12

## 12. Termination of Graduate Assistantship Without Cause

The second adverse action on **June 30, 2025**, was a memorandum from Department Chair Dr. Yi Yang notifying me that my Graduate Research Assistantship would not be renewed for the **2025–2026** academic year (*Exhibit I – June 30, 2025 memorandum*). The notice cited only a vague reference to "faculty recommendation" and offered no explanation, evidence, or supporting documentation.

This action was wholly inconsistent with my established record of service. Over more than four years as a graduate assistant, I was never advised of any performance concerns, nor was I given notice or an opportunity to address any alleged deficiencies. To the contrary, only weeks earlier, faculty had provided written commendation expressly recognizing the quality of my work and contributions to assistantship projects (*Exhibit Z7*).

The abrupt shift from documented commendation to termination without explanation underscores the absence of legitimate cause. The decision—made without transparency, due process, or any record of deficiencies—was arbitrary and inconsistent with the University's own stated procedures and expectations for graduate assistants.

*True and correct copies of the **June 30, 2025 termination memorandum**, the **Chair's correspondence on non-renewal**, and **faculty commendation of my contributions** are attached as Exhibits I, F, and Z7.*

## 13. Provisional Status Threat Based on Misuse of Abilities Transcript

The third adverse action on **June 30, 2025**, was a memorandum from Graduate Program Coordinator Dr. Marie Barnard warning that I would be reclassified as a "provisional" student for allegedly failing to submit an Abilities Transcript ("AT") (*Exhibit J – June 30, 2025*

*memorandum*). The memorandum mischaracterized the AT as a "non-coursework academic performance expectation."

In reality, the Abilities Transcript is defined by the University as a developmental self-assessment tool intended to support mentoring and professional growth—not as an evaluative or disciplinary requirement (***Exhibit Z9 – Abilities Transcript Guide and Form***). Using it as the basis for punitive action contradicted its stated purpose and represented a clear misapplication of University policy.

I consistently affirmed my willingness to complete the Abilities Transcript, recognizing its value as a developmental tool. By **June 30, 2025,** however, unresolved disputes over denied accommodations and procedural violations made good-faith submission impossible. These same barriers had already forced postponement of my comprehensive exam, disrupting my academic progress and delaying completion of a core milestone. Department Chair Dr. Yi Yang and Graduate School Dean Dr. Annette Kluck were copied on related correspondence and were fully aware of these circumstances (***Exhibits B and C***). Nevertheless, the **June 30** memorandum threatened to downgrade my status to "provisional" as if these barriers did not exist, disregarding both documented context and basic due process.

From my perspective, this omission was not mere oversight. Because the Abilities Transcript was tied to accreditation compliance, the Department had a strong institutional incentive to ensure its completion. Acknowledging my documented complaints, however, would have required admitting prior violations. The Department therefore chose to issue the threat of a punitive and disproportionate sanction—mischaracterizing a developmental, non-evaluative tool as a disciplinary requirement—rather than address my complaints. This action was

14

intended to compel submission and shield accreditation standing, at the expense of fairness and compliance with due process.

*True and correct copies of the **June 30, 2025 memorandum**, correspondence reflecting administrative evasion by **Dr. Yi Yang and Dr. Annette Kluck**, and the **University's Abilities Transcript materials** are attached as **Exhibits J, B, C, and Z9**.*

14. **Barriers to Appeal, Denial of Due Process, and Absence of Neutrality or Fairness**

After the **June 30** sanctions, I promptly objected and sought to challenge them. On **July 7** and **July 15, 2025**, I submitted rebuttal letters to Provost Dr. Noel Wilkin disputing the charges as factually unfounded and procedurally defective (**Exhibits L and N**). In those letters, I made clear that I was prepared to pursue a formal appeal if the University first complied with its own policies by providing the notice and information required for a fair and informed process.

Instead of providing the notice and information I requested, Assistant Provost Dr. Jennifer Simmons directed me to initiate the University's formal appeal procedures without first addressing these missing prerequisites. In a **July 7, 2025** email, Dr. Simmons wrote that "*the sanction is a warning not to repeat the behavior described in the instructor's submission and that repeating the offense could result in increased punishment*" (**Exhibit M**). This communication not only presumed misconduct during the pendency of the appeal but also failed to provide the essential due process and University policy safeguards I had specifically requested, including:

1. A factual description of the alleged conduct;

2. Citation of the specific rule purportedly violated; and

3. Disclosure of supporting evidence.

I was therefore directed to pursue an appeal without being informed of the factual or legal basis of the charge. This improperly shifted the burden onto me to disprove a vague and unsubstantiated allegation, while relieving the Department of its duty to clearly state its claim and produce supporting evidence. It also attempted to retroactively validate a process that was void from the outset. By withholding these safeguards, the University rendered the appeal process illusory and deprived me of any meaningful opportunity to pursue a fair, informed, and lawful appeal, in violation of both its written policies and the Fourteenth Amendment's guarantee of due process.

Further, in response to my **July 15** rebuttal—which presented a prima facie case of retaliation under the standards of the American Association of University Professors (AAUP), the Americans with Disabilities Act (ADA), Section 504 of the Rehabilitation Act, and guidance from the U.S. Department of Education's Office for Civil Rights (OCR)—Dr. Simmons referred me back to departmental leadership, including the Department Chair. This was the very official named in my complaint and directly involved in the adverse actions. Such a referral undermined neutrality, fairness, and objectivity in grievance handling, demonstrated deliberate indifference to my rights, and further eroded confidence in the integrity of the University's process.

*True and correct copies of my **July 7 rebuttal letter**, **July 15 response letter**, and correspondence with the Assistant Provost are attached as **Exhibits L, N, M, and O**.*

15. **Escalation of Probation Beyond Department Recommendation**

In its **June 30, 2025** memorandum, the Department recommended that I be placed on one semester of probation, citing the unfounded allegation of "disruption" during a peer's thesis defense (**Exhibit H** *– June 30, 2025 memorandum*).

16

On **August 5, 2025**, the University escalated this sanction to probation for the remainder of my enrollment (***Exhibit R – August 5, 2025 Registrar's letter***). This escalation went beyond the Department's original recommendation and was imposed without any new evidence, rationale, or procedural safeguards.

The Registrar's letter asserted that I failed to exercise my right to appeal within 14 days, thereby creating the false impression that I neglected available remedies. In reality, between **July 7** and **July 15, 2025**, I submitted detailed rebuttals and due process objections, expressly stating that I was prepared to appeal if the University first provided the prerequisites for a meaningful appeal under its own policies (***Exhibits L and N***). On **July 10, 2025**, Assistant Provost Dr. Jennifer Simmons acknowledged these objections in writing, confirming that the University was on notice of my intent to appeal and the barriers that prevented me from doing so (***Exhibit M – July 10, 2025 email***).

Despite this notice, the University never provided the required prerequisites for a fair appeal. My good-faith objections and clear intent to appeal were later mischaracterized as a "failure to appeal." By converting a limited departmental recommendation into an indefinite sanction while my objections remained unresolved, the University disregarded its own faculty's recommendation, departed from its written policy, and compounded the denial of due process. This escalation was arbitrary, punitive, unsupported by evidence, and in violation of both University policy and the Fourteenth Amendment's guarantee of due process.

*True and correct copies of the **Department's June 30, 2025 recommendation, Assistant Provost's July 11, 2025 email**, and the **University's August 5, 2025 escalation** are attached as **Exhibits H, M, and R**.*

16. **Improper Downgrade to Provisional Status**

On **August 21, 2025**—sixteen days after the escalation to indefinite probation—Graduate Program Coordinator Dr. Marie Barnard issued a memorandum recommending that I be downgraded to provisional status (**Exhibit Z3** – *August 21, 2025 memorandum*). Unlike the **June 30** notice, this memorandum imposed a new and expanded set of conditions, including submission of an Abilities Transcript by September 30, 2025, weekly advisor meetings, submission of a dissertation draft, and mandatory professional development activities. These requirements had never been previously communicated and bore no connection to any documented academic deficiency.

Because a downgrade from full to provisional status could not reasonably be justified by the non-submission of a developmental, non-evaluative document, the imposition of these additional requirements manufactured the false appearance of broader performance deficiencies that had never been identified. In effect, they served as post hoc rationalizations for a sanction that lacked any legitimate academic basis.

On **August 22, 2025**, Graduate School Dean Dr. Annette Kluck ratified the downgrade in a formal letter (**Exhibit Z4** – *August 22, 2025 letter*). This action bypassed University policy, which requires that changes in academic status be: **(1)** recommended by an appropriate faculty group—not imposed unilaterally by a program coordinator or chair, and **(2)** supported by documented academic performance deficiencies. The University's M Book further provides that **(3)** such status changes should "ordinarily" occur between semesters to avoid disruption of enrollment, tuition, financial aid, and immigration status (**Exhibit AA** – *University policy*). Despite these safeguards, the downgrade was imposed after the Fall 2025 semester had already begun. Moreover, while citing the governing policy, Dean Kluck's letter selectively omitted the very safeguards that were bypassed, demonstrating a knowing and willful disregard of

University policy and further compounding the denial of due process (***Exhibit Z4*** – *August 22, 2025 letter*).

The imposition of pretextual conditions, their immediate ratification by senior leadership, and the timing in direct violation of University policy collectively show that the downgrade was procedurally invalid and substantively unfounded. Rather than addressing my pending accommodation and policy complaints, the University imposed a flawed and improperly timed sanction that disrupted my academic progress and jeopardized my lawful F-1 enrollment status. *True and correct copies of the **August 21, 2025 memorandum**, the **August 22, 2025 ratification letter**, and the **University's policy on status changes** are attached as **Exhibits Z3, Z4, and AA**.*

## II.     CLARIFICATION OF COURT'S MEMORANDUM OPINION

### 17. Service and Notice of Service

The Court's **September 19, 2025**, *Memorandum Opinion* states that "*...The Defendants in this matter have not been served...*" (*Court's Order, Docket No. 16, p. 4*). Respectfully, this statement does not accurately reflect the record.

On **September 10, 2025**, the U.S. Marshal executed service on the University of Mississippi and the named defendants. Proof of service was filed on **September 15, 2025**, as reflected in the docket (*Docket No. 15 – Summons Returned Executed*). Thus, by the time the Court issued its order on **September 19, 2025**, service had been completed and was part of the record.

This clarification is significant because the Court's analysis relied on the mistaken assumption that service had not occurred. In fact, both service and notice of service were effectuated before the Court's ruling.

19

18. **Sequence of Accommodation Requests**

The Court's **September 19, 2025**, *Memorandum Opinion* states that I was "*directed to go through the University's Student Disability Services (SDS)*" when seeking accommodations, and that *faculty examiners refused to alter the exam format despite my request* (*Court's Order, Docket No. 16, p. 1*). Respectfully, this characterization does not reflect the actual sequence of events. My accommodation requests were categorically denied by the Department before SDS was ever substantively involved, and at no time in **April** or **May 2025** did any Department official refer me to SDS.

The correct chronology is as follows:

1. On **April 25, 2025**, I independently contacted Student Disability Services (SDS) to inquire about exam accommodations (***Exhibit Z10***).

2. SDS advised that, absent any written policy barring such requests, I could submit directly to the Department, and that once submitted, the Department was responsible for responding and determining how to proceed (***Exhibit Z10***).

3. Relying on this guidance, I submitted written requests to the Department Chair on **April 27, 2025** (***Exhibit A***).

4. The Department categorically denied those requests on **May 5, 7,** and **9, 2025**, without engaging in the required interactive process (***Exhibit B***).

5. Only after those denials did I escalate my concerns on **May 9, 2025**, to SDS again and to senior administrators, including the Provost and Graduate School Dean (***Exhibits Z10, D, C***).

6. Senior administrators subsequently ratified the Department's denials (***Exhibits E and C – Dean Kluck's June 2, 2025 letter and June 25, 2025 correspondence***).

7. SDS did not provide a substantive response until **June 4, 2025**—over a month after my initial request—by which point it was too late to remedy the earlier denials (*Exhibit Z10*).

This clarification is significant because the duty to engage in the interactive process under the ADA and Section 504 attaches immediately upon receipt of an accommodation request. That obligation cannot be postponed, excused, or retroactively cured by a later referral to SDS. Respectfully, the sequencing in the Court's *Memorandum Opinion* misstated the sequence of events and thereby inadvertently mischaracterized the source of the violation—shifting responsibility away from the Department when, in fact, the denials occurred before SDS was ever substantively involved.

19. **Lack of Notice Regarding Disruption Allegation**

The Court's *Memorandum Opinion* notes that the **June 30, 2025** disciplinary memorandum contained no details and that "*the details of the incident were not shared with the Court*" (*Court's Order, Docket No. 16, p. 2*). Respectfully, this absence of detail was not due to any omission on my part, but rather a direct consequence of a fundamental defect in the University's process.

From the time I received the memorandum, I repeatedly requested clarification of what specific conduct or remarks in an academic setting were alleged to constitute "disruption." No faculty member or administrator has ever identified the particular words, actions, or policies at issue. Neither the memorandum nor any subsequent correspondence provided the factual detail or citations necessary to support the charge.

This lack of notice violated the University's mandatory disciplinary safeguards. The M Book requires at minimum: **(1)** a documented discussion between faculty and the student, giving the

21

student an opportunity to respond, and **(2)** a written report specifying the incident, the communications with the student, and the basis for any recommended sanction. None of these safeguards were observed.

Without this information, I was unable to prepare a meaningful rebuttal or pursue an informed appeal. No student can reasonably be expected to defend against an allegation that is never specified. This defect rendered the sanction procedurally invalid and deprived me of both the protections required by University policy and the fundamental guarantees of due process.

*True and correct copies of the **June 30, 2025 disciplinary memorandum, related correspondence,** and the **University's disciplinary policy** are attached as **H, G,** and **Z11**.*

20. **Clarification of Appeals Process**

The Court's *Memorandum Opinion* states that I "failed to" use the University's formal appeal procedures after Assistant Provost Dr. Jennifer Simmons directed me to do so, and that this alleged failure led to ratification of my probation and provisional status (*Court's Order, Docket No. 16, p. 3*). Respectfully, this conclusion is inconsistent with the record.

I did not fail or refuse to appeal. Rather, I was unable to do so because the University never provided the essential prerequisites for a viable appeal—specifically: **(1)** a description of the conduct alleged; **(2)** citation of the rule or policy purportedly violated; and **(3)** disclosure of supporting evidence (***Exhibit Z11***). Absent these fundamentals, any appeal would have been illusory rather than meaningful.

Between **July 7** and **July 15, 2025**, I submitted rebuttals and due process objections expressly stating that I was prepared to appeal once the University provided the information necessary to make any appeal viable (***Exhibits L and N***). On **July 10, 2025**, Assistant Provost Dr. Jennifer Simmons acknowledged these objections in writing, confirming that the University was on

22

notice of both my intent to appeal and the barriers preventing me from doing so (*Exhibit M*). Nevertheless, the University never supplied the required information. Instead, on *July 22, 2025*, the university through Dr. Jennifer Simmons attempted to recharacterize my rebuttals as an "appeal" (*Exhibit O*)—a retroactive maneuver that sought to legitimize a process void from its inception. Established precedent makes clear that when a disciplinary proceeding is constitutionally defective at the outset, no subsequent appeal can cure those defects.

*True and correct copies of the **University's disciplinary policy, my rebuttal letters, and correspondence with the Assistant Provost** are attached as Exhibits Z11, L, N, M, and O.*

21. **Clarification of "Non-Coursework Academic Performance"**

The Court's *Memorandum Opinion* states that I was threatened with provisional status for "failing to meet required non-coursework academic performance expectations," and that I informed Dr. Barnard of procedural barriers preventing my "performance" (*Court's Order, Docket No. 16, p. 2*). Respectfully, this characterization does not accurately reflect the record.

The issue was not academic performance but the Abilities Transcript ("AT")—a developmental self-assessment tool defined by the University as a mentoring aid, not an evaluative or disciplinary requirement (*Exhibit Z9*). By substituting "performance" for "Abilities Transcript," the Court's summary inadvertently obscured that the status downgrade rested solely on alleged non-submission of a non-evaluative tool, not on any academic deficiency.

This clarification is critical: the sanction was not grounded in any academic or performance deficiency, but in the University's misuse of a developmental, non-evaluative tool, compounded by its failure to address my pending accommodation requests and procedural complaints.

23

*True and correct copies of the **June 30, 2025 memorandum**, and the **University's Abilities Transcript materials** are attached as J, and Z9.*

## III.   IMMEDIATE AND IRREPARABLE HARMS

### 22. Loss of Lawful Immigration Status

The termination of my assistantship funding eliminated the financial support documented on my SEVIS Form I-20. Federal regulations under *8 C.F.R. § 214.2(f)* require both full-time enrollment and proof of adequate financial support to maintain lawful F-1 student status. Absent immediate restoration of funding, my SEVIS record will be terminated, causing the loss of my lawful immigration status.

### 23. Enrollment and Educational Disruption

The downgrade to "provisional status" and the resulting loss of tuition remission caused the University Bursar to issue a Balance Notice of $16,953.80 on **September 15, 2025 (*Exhibit Z13*)**. This outstanding balance will trigger enrollment holds before the next registration period, preventing me from registering for courses, accessing transcripts, or maintaining the full-time enrollment required for F-1 status. These holds will lead to administrative withdrawal and SEVIS termination, creating escalating and irreparable harm unless the pre–June 30, 2025 status quo is restored.

*True and correct copies of the **September 15, 2025 Balance Notice** are attached as **Exhibit Z13**.*

### 24. Financial Crisis and Housing Instability

The loss of assistantship funding has caused cascading harms. I am now more than two months behind on rent, face imminent eviction, and lack resources to meet basic living expenses, including food and groceries. These conditions directly threaten my housing stability, health,

24

and ability to continue coursework and research, and they worsen daily absent immediate restoration of the *status quo ante*.

25. **Reputational and Psychological Harm**

The disciplinary designations of "disruption," "indefinite probation," and "provisional status" now appear on my academic record, inflicting immediate reputational harm, jeopardizing future academic and professional opportunities, and imposing lasting stigma. These labels have also caused escalating psychological distress. Such harms cannot be undone or compensated through monetary damages, rendering them irreparable under ***Rule 65*** and warranting immediate injunctive relief.

26. **Loss of Standing**

If enrollment holds, SEVIS termination, or the inability to meet basic living expenses compel me to leave the United States, I will lose standing to prosecute this case, be unable to participate in discovery or proceedings, and face a substantial risk that my claims will be declared moot. This would irreparably deprive me of meaningful judicial review. The risk is imminent—not speculative—given my unresolved tuition balance, probationary status, terminated assistantship funding, and mounting arrears in rent and living expenses.

## CERTIFICATE OF SERVICE

I hereby certify that on October 15th, 2025, I delivered the foregoing to the Clerk of Court for filing and served a true and correct copy by email upon:


**Paul B. Watkins, Esq.**

Mayo Mallette PLLC

Email: pwatkins@mayomallette.com

(cc: Brooke Jackson, bjackson@mayomallette.com)


Executed this 15th day of October, 2025, in Oxford, Mississippi.

Omokhodion Alfred Eriakha

Plaintiff, pro se

1802 Jackson Ave. W., Apt. 83

Oxford, MS 38655

Tel: (662) 281-4676

Email: eriakhab@gmail.com